# Newport Home Water Co., Appellant, *v.* The Public Service Commission.

*Public Service Commission—Water companies—Valuation for rate-making purposes—Property used and useful—Depreciation—Failure to provide fund.*

An order of the Public Service Commission determining the valuation of a water company for rate-making purposes at $51,538 is not confiscatory, where the reproduction cost new, less accrued depreciation, and after making deductions for property not used or useful, equals that amount.

In the determination of a valuation for rate-making purposes it is proper to deduct the value of a reservoir and wells which were not used and useful in the public service.

In determining the fair value of a water company for rate-making purposes, different methods may be used in computing the losses in early years, during the development period of the business, for the purpose of capitalization, and as an aid to judgment in deciding whether or not such early losses should be capitalized. Whatever method is adopted, however, it is necessary, in order to arrive at any satisfactory conclusion, that there must be some evidence as to the operating expenses and gross revenues of the company during the years of the development of the business. Where there is testimony submitted that the original plant was completed within six months, and that there was no evidence on which to found a confident assertion that the business of the company was not profitable from the beginning, there is nothing to warrant a finding that the company is entitled to an allowance,

as capital, for any loss sustained by it, during the period of development of its business.

A public service company is entitled to see that, from the earnings, the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was in the beginning. If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment uninjured, whether this is the result of unwarranted dividends upon over-issues of securities or omission to exact proper charges for its service, the fault is its own. When, therefore, a public regulation of its prices comes under question, the true value of the property then employed for the purpose of earning a return, cannot be enhanced by a consideration of the errors in management which have been committed in the past.

Where a water company has failed to make any provision out of its earnings for the replacement or depreciation of its property, it cannot ask for an allowance for such depreciation which would have been taken care of, if the earnings had been properly applied.

Argued October 27, 1919. Appeal, No. 19, March T., 1919, by Newport Home Water Company, from order of the Public Service Commission of the Commonwealth of Pennsylvania, Complaint No. 539, in the case of W. G. Loy et al. v. Newport Home Water Company. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER and KELLER, JJ. Affirmed.

Complaint against increased schedule of rates filed by Newport Home Water Company, effective January 15, 1916.

The complaint alleged that the charges were unjust and unreasonable.

After hearing, the Public Service Commission found the true value of the property of the Newport Home Water Company for rate-making purposes to be $51,-538.

The commission also found the water company should receive a return upon the value of its plant, determined as aforesaid, at the rate of 7% per annum, amounting to $3,607.66; that it should be allowed $2,625 yearly for operating expenses, and that it should be allowed an

388 NEWPORT HOME W. CO., Appel., *v.* PUB. SER. COM.

Statement of Facts—Opinion of the Court. [76 Pa. Superior Ct.
annual depreciation charge of $800. This required an annual revenue of $7,032.66. The commission made an order directing the water company to file a schedule of rates which would return that amount of revenue only. The respondent company appealed.

*Error assigned,* among others, was the order of the commission.

*William H. Sponsler,* and with him *J. E. B. Cunningham,* for appellant.

*James W. Shull,* for intervening appellee.

*Berne H. Evans,* Counsel, and with him *John Fox Weiss,* Assistant Counsel, for the Public Service Commission.

OPINION BY PORTER, J., April 18, 1921:

This case was one of a number which involved the question of the nature of the jurisdiction to be exercised by this court in appeals from the determination of the Public Service Commission fixing the valuation of the property of a public service company, used and useful for the service of the public, upon which it was entitled to receive a reasonable return, in proceedings to fix the rates which the public service company might lawfully charge. The question of the nature and extent of our jurisdiction to review such determinations of the Public Service Commission had been involved in the case of Ben Avon v. Ohio Valley Water Co., in which the decision of this court had been reversed by the Supreme Court of Pennsylvania, 260 Pa. 289; and in which an appeal was then pending in the Supreme Court of the United States. The decision of this appeal has been delayed in order to await the final determination of the jurisdictional question. The Supreme Court of Pennsylvania having now remanded the case of Ben Avon v.

Ohio Valley Water Co. to this court with direction to determine, upon our own independent judgment as to the law and facts, whether the order of the Public Service Commission is confiscatory, it becomes our duty to dispose of this appeal upon the principles established by that decision.

The appellant having filed a schedule of rates or charges for its service to the public, complaints were filed on behalf of the borough and of a number of private consumers of water. The parties proceeded to hearings before the commission upon the issues raised by the complaints. They concurred in an arrangement to have a board of engineers, one appointed by the appellant, one by the complainants and the third by the Pubic Service Commission, to determine the present value of the property of the appellant used in the service of the public. It was also agreed that the accountants of the commission, an accountant representing the appellant and a third representing the complainants, should examine the books of the appellant and make a report, or reports, as to the amount invested by the company in its property devoted to the service of the public, and that such reports should be submitted as evidence. The accountants did not agree in their reports as to the historical cost of the plant, but while there was some disagreement among them as to subsequent expenditures, the vital difference between them was as to the amount which had been invested by the company prior to January 1, 1901. The company was organized in the summer of 1893 and the only book which there is any evidence that it ever kept prior to January 15, 1901, was a minute book, in which seem to have been entered, however, the amounts expended by the company in acquiring its property and rights of way and the construction of its plant. The accountant of the commission found, from the evidence contained in the minute book, that the company had expended in acquiring its property and constructing its plant, prior to January 1, 1901, the sum of $33,202.61.

The company had opened regular books of account about January 1, 1901, and those books contained an entry, as of January 15, 1901, stating that the amount of the investment of the company prior to that date had been $60,221. The accountants of the commission found the historical cost of the plant, down to date of hearing, to be $51,624.40; the accountant representing the complainants reported the historical cost to be a small amount greater; while the accountant of the water company reported the historical cost to be $82,516.96. We have examined with great care the evidence, oral and documentary, as to the historical cost of the appellant's plant, and are convinced that the estimate of the accountant of the water company ought not to be given serious consideration. When the company opened its regular set of books, in January, 1901, some person may have told the bookkeeper, who made the entry, that the investment of the company down to that date was $60,-221, but it is manifest that was a mere guess, and the evidence clearly indicates that it was an exaggeration. The total amount of the stock of the company then outstanding was less than $30,000, but let it be assumed that it had all been issued. The minute book clearly established that the stockholders had not paid more than ten per cent on their stock and that those who held stock in January, 1897, had paid an additional assessment of $1 per share; even assuming that it had all been issued in 1897, the amount paid in on the stock could not have been more than $4,200, or the original ten per cent paid, $3,000, and the assessment of $1 upon each share, the shares being of the par value of $25 and the total number 1,200 shares. The company had prior to that date issued bonds to the amount of $30,000, which according to the testimony of Mr. Ahrens, the only witness who seemed to know anything about the operations of the company prior to 1901, had been sold at from 95 per cent up to par, so that there could not have been realized from the sale of the bonds more than $30,000. The pro-

ceeds of the bonds and the amount paid in on the capital
stock aggregated not more than $34,200. Mr. Ahrens
testified that at times, when all the bonds had not been
sold, during the progress of construction, the company
borrowed money from the banks, the parties interested
putting their individual names on the notes, with bonds
in the amount thereof as collateral, but that the total in-
debtedness never exceeded the amount of the bonds. Mr.
Ahrens testified that when he and those associated with
him sold the plant to Mr. Gring, in July, 1906, it had
cost approximately $40,000. The books of the company
show that during the period between January, 1901,
and the date when Ahrens sold the plant the company
expended for extensions thereto over $5,500, so that the
testimony of the witness is really corroborative of the
finding of the accountant of the commission that there
had been invested in the plant, prior to January, 1901,
only $33,202.61. The amount invested in the plant sub-
sequent to that date was $18,421.79, making the total
historical cost of the plant $51,624.40. There was, how-
ever, included in this amount $9,911.29 which had been
expended in the construction of a reservoir and $1,871.63
which had been expended for drilling wells, neither of
which are now or have for many years been used in the
public service. The reservoir had either been improperly
constructed, or it had been unwisely located upon an
underlying stratification permitting the water to escape;
it leaked and after a short time was abandoned by the
company. There is nothing in the evidence which would
sustain a finding that this reservoir is now or ever can
be used or useful for the service of the public. The
driven wells were abandoned, for the reason that the
company was threatened with litigation if it continued
to use them, and it thereupon acquired property and con-
structed a plant for taking water from the Juniata
River. The wells are neither used nor useful in enabling
the appellant to furnish water to its consumers. De-
ducting the amount of these expenditures from the total

amount of the historical cost we have left the sum of $39,841.48, as the historical cost of the property now used for the service of the public. The historical cost of a plant is not controlling in determining the present value of the property devoted to the service of the public, but it is an element which it is proper to consider, particularly in view of the fact that this appellant complains that the Public Service Commission did not, in determining the value of the property, make any allowance for the fact that it was a "going business."

The engineers, representing the Public Service Commission and the parties, respectively, agreed in their report that the reproduction cost (new) of all appellant's used and useful property would be $64,665; they agreed, also, that the parts of the plant which were depreciable should be charged with depreciation to the amount of $13,127, leaving the present value of the plant $51,538. The engineer representing the water company concurred in the findings as to the value of the property of the company now used in the public service, but contended that the amounts expended for the abandoned reservoir and wells should be included in the valuation of the property upon which appellant was entitled to a reasonable return and, also, a large amount as the cost of developing the water company's business, its going-concern value. The Public Service Commission found the true value of the plant to be $51,538, saying: "Giving due consideration to all the factors presented, we are of opinion that the fair value of the respondent's property, used and useful in rendering public service, and considered as a going-concern, is $51,538." The commission found that the water company should receive a return upon the value of its plant, determined as aforesaid, at the rate of seven per cent per annum, amounting to $3,607.66; that it should be allowed $2,625, yearly, for operating expenses, and that it should be allowed an annual depreciation charge of $800, thus requiring an annual revenue of $7,032.66. The commis-

sion made an order directing the water company to file a schedule of rates, together with the necessary supporting data which would return that amount of revenue annually.

The first question which the appellant asserts to be involved in this case is: "In the valuation for rate-making was the commission justified in deducting from a cost-new or cost-of-reproduction, an accrued depreciation which had never been earned, without making an equitable or other proper disposition of it?" The appellant does not contend that the amount of the depreciation, $13,127, was not ascertained by scientific methods now well established. The complaint is that it is unjust to charge off the depreciation without making some equitable provision for it, either by adding it to the amount upon which the company would be entitled to receive a return, or by providing for the amortization of it, by permitting the company to exact rates which would return a given percentage on it, say five, thus reimbursing the company for this depreciation of its property, during a period of twenty years. The complaint is founded on the assertion that the earnings of this company had not been sufficient to enable it to establish a reserve to take care of this depreciation. In dealing with a question of this character it was said by the Supreme Court of the United States: "The company is not bound to see its property gradually waste without making provision out of the earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning......If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon over-issues of securities or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under ques-

tion, the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past": Knoxville v. Knoxville Water Co., 212 U. S. 14. This appellant had failed to make any provision out of its earnings for the replacement of the depreciation of its property. Consideration of all the testimony leads us to the conclusion that the earnings of the company were sufficient to provide an ample reserve for depreciation, if those earnings had been properly applied. The company, in July, 1906, voted to increase its bonded indebtedness from $30,000 to $80,000, a portion of the new bond was used for the purpose of retiring the old bonds then outstanding, and $44,000 of that issue of bonds were delivered to D. Gring, who was then the president of the company, and out of the proceeds of those bonds he expended only $5,324.65 for the purposes of the company. It thus appears that this company has, since 1906, been paying to its president interest, at the rate of five per cent, on over $38,-000. The amount of the earnings thus misapplied would have not only been sufficient to provide an ample fund to meet depreciation but to pay in addition, a dividend on the entire issue of the capital stock of the company. This fact alone seems to be sufficient answer to the contention of the appellant upon this branch of the case. It seems to be indeed fortunate for this company that after this strain upon its resources and notwithstanding the fact that the reservoir and wells in which it invested $11,782.92, proved useless, the present value of its plant, after all deductions for depreciation, as found by the commission, is still practically equal to the total historical cost of the plant.

The contention of the appellant that the Public Service Commission, in fixing the present valuation of the plant, erred in failing to allow for the cost of establishing the business, the going-concern value, as distinguished from the value of the physical property, is equal-

ly without merit.  We have already said that the books
of the company during the period when its business was
established and developed, failed to disclose either the
gross or net revenues and the operating expenses.  Dif-
ferent methods may be used in computing or attempting
to compute and determine the losses in early years dur-
ing the development period of the business of a public
service company, for purposes of capitalization, and as
an aid to judgment in deciding whether or not such early
losses should be capitalized.  Whatever method is adopt-
ed, however, it is necessary, in order to arrive at any
satisfactory conclusion, that there must be some evi-
dence as to the operating expenses and gross revenues of
the company during the years of the development of its
business.  The engineers, in the present case, being with-
out any evidence as to the essential facts, attempted to
make a guess at what those facts might have been, and
then based a computation upon the facts assumed.  The
difficulty is that the facts assumed are not in harmony
with certain collateral facts, clearly established by the
records of the company, and the testimony of Howard E.
Ahrens.  Mr. Ahrens testified that he built the original
plant and that the construction was completed in from
four to six months.  He testified that the plant earned
the interest on its bonds down until the time the original
owners sold the property to Mr. Gring and his associates,
and at the time they sold it it was paying six per cent
on the stock.  The records of the company show that
Mr. Gring and his associates assumed direction of the
affairs of the company on July 5, 1906, Mr. Gring then
owning 1,197 shares, out of a total capitalization of 1,200
shares.  Prior to that date the whole amount paid in, as
capital, by the stockholders had been $4,200 and there
had been paid out in dividends $5,047.98, or $847.98
more than the total amount paid in by the stockholders.
When the new stockholders assumed charge the policy
of the company seems to have been changed, no divi-
dends having been declared on the stock during the suc-

ceeding period of seven years, but, instead of receiving dividends, Mr. Gring, who owned nearly all the capital stock, had received from the company, in 1906, over $38,000 in bonds of the company, as above stated, without having paid any consideration, and upon those bonds the company has regularly paid the interest. There is in the case no evidence upon which to found a confident assertion that the business of this company was not profitable from the beginning; nothing to warrant a finding that the company is entitled to an allowance, as capital, for any loss sustained by it during the period of the development of its business. We find nothing in the record to warrant us in holding the order of the commission to be confiscatory.

The determination of the Public Service Commission is affirmed and the appeal dismissed at cost of the appellant.