Wilson and Wilson, Appellants, *v.* The Public Service Commission of Pa.

Argued November 10, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Stadtfeld, JJ.

*S. Davis Wilson,* and with him *Sarah E. Wilson,* for appellants.

*E. Everett Mather, Jr.,* Assistant Counsel, and with him *John Fox Weiss,* Counsel, for appellee.—It is the duty of the Public Service Commission to give weight to the opinions of municipal bodies as to what they deem the best interests of their public: City of Philadelphia v. Public Service Commission, 84 Pa. Superior Ct. 135.

*Frederic L. Ballard,* and with him *Allen Hunter White,* for Philadelphia Rapid Transit Company, intervening appellee.

*G. Coe Farrier,* and with him *Ernest Lowengrund,* Assistant City Solicitors, and *Augustus Trask Ashton,* City Solicitor, for City of Philadelphia, intervening appellee.

OPINION BY CUNNINGHAM, J., December 11, 1931:

Under date of June 27, 1930, the City of Philadelphia (hereinafter referred to as the city), pursuant to an ordinance, entered into a contract with Philadelphia Rapid Transit Company (hereinafter referred to as the company) for the leasing by the city to the company of a city-built subway, known as the Broad Street

Subway and extending from Kater Street to Grange Avenue. As the lessee is a public service company, operating a system of surface, elevated and underground, railways in the city, approval of the contract by the Public Service Commission was required by Article III, Section 11, of our Public Service Company Law of July 26, 1913, P. L. 1374. Application for a certificate evidencing the commission's approval was made by the company and joined in by the city. Protests were filed and hearings had, pursuant to sections 18 and 19 of Article V, with the result that the commission, on June 2, 1931, made its report and order finding that the granting of the petition was "necessary and proper for the service, accommodation, convenience and safety of the public," and directing that a certificate issue—the subway having been operated by the company during the pendency of the proceeding under a temporary approval.

From this administrative order S. Davis Wilson and Sarah E. Wilson, taxpayers of the city and protestants before the commission, have appealed to this court. By section 22 of Article VI, as amended by the Act of June 12, 1931, (No. 172), we are directed to determine, upon the record certified to us, "whether or not the order appealed from is reasonable and in conformity with law," and by section 23, as amended, it is provided that the order "shall be prima facie evidence of the facts found and the burden of proving the contrary shall be upon the appellant or appellants."

Eleven errors have been specified in support of the appeal petition; their general purport is that the commission failed to protect adequately the "vested interests of the city and its taxpayers" in the subway; that the rentals provided for in the lease were "grossly inadequate;" that the commission exceeded its jurisdiction by determing questions of law and fact in-

volved in litigation pending in the courts, and, in effect, approved a compromise of a claim of the taxpayers against the company, amounting approximately to $3,-000,000, for the inadequate sum of $475,000; and that the commission erred in declining to admit in evidence a report relative to the operation of the subway, formulated by Dr. Milo Maltbie and, submitted by him to the city controller. The order of the commission does not contain any findings of fact or statement of its reasons for approving the contract. We are not to be understood as approving of this practice in a case of this character. Issues of fact were involved and the commission, as the fact finding body, should have made specific findings of the facts upon which it based its conclusion. It is proper to note, however, that the order was entered prior to the approval of the amendment of 1931, supra, which clearly contemplates the making of specific findings by the commission as it is therein provided that the order shall be prima facie evidence of the "facts found." As important public interests are involved we deem it inadvisable to delay the disposition of the matter by returning the record to the commission for findings and have accordingly examined the testimony and exhibits for the purpose of ascertaining what material facts were established by competent evidence.

Certain historical facts, which seem to be undisputed, throw light upon and explain the rather unusual provisions of the lease with respect to the term thereof and the fixing of rentals thereunder. The subway was constructed and equipped by the city at a total cost of approximately $103,000,000, provided by city loans, the annual interest and sinking fund charges upon which aggregate about $6,000,000, to be paid by the present and future taxpayers. Appellants were therefore entitled to protest against the approval of the lease upon the ground that the city, in their opinion,

had submitted a contract which was improvident and unjust in so far as the rights of taxpayers were concerned.

The contract now under consideration is not the first lease entered into between these parties for the same subway. Upon completion of the northern section in 1928 it was leased by the city to the company, under the authority of an ordinance approved August 29th of that year, at a rental of $200,000 per month, beginning September 1, 1928. This lease was terminated by the company, in the exercise of its rights thereunder, as of December 1, 1928; the rentals for the three months it remained in effect, aggregating $600,000, were paid to the city. The company asserted its total gross receipts for this period were less, by $135,862, than the amount of the rentals it paid. In terminating the lease, the company notified the city it stood "ready to operate the subway until such time as a new agreement can be reached, the terms of which can be made retroactive to December 1, [1928]." On December 12, 1928, it was resolved by city council that "authority be ....... granted to [the company] to operate [the subway] until such time as a new agreement may be entered into ...... relating to the future operation thereof," and the mayor was directed to negotiate with the company for a new lease, the terms of which should be retroactive, etc. The purpose of the parties seems to have been to provide for the operation of the subway for an experimental period, to the end that negotiations with respect to a proper rental might be based upon experience rather than anticipations. The subway, including the southern section completed in April, 1930, was accordingly operated by the company, with the approval of the commission, under this so-called "Gentlemen's Agreement" from December 1, 1928, until July 1, 1930, the effective date of the present lease, or a period of nineteen months.

During this period no payments whatever were made by the company to the city on account of rental.

Under these circumstances, and as a result of various analyses of the figures and prolonged negotiations, it was provided in the present lease that the term thereof "shall be retroactive to December 1, 1928, and shall extend from that date to December 31, 1932, and thereafter shall continue in effect from month to month, unless and until terminated by either party giving to the other notice in writing," etc.; the provisions with respect to notice of termination are immaterial to the present issue. The rental provisions of the lease may be thus summarized: For the retroactive period, December 1, 1928, to June 30, 1930, the company agreed to pay rental at the rate of $25,000 for each of the nineteen months embraced therein, aggregating $475,000, which amount is to be paid in equal monthly payments of $15,833.33⅓, each, "over the period of thirty months from the first day of July, 1930," i. e., until December 31, 1932. Termination of the present lease prior to December 31, 1932, will not affect these payments. As to that portion of the term beginning on the first day of July, 1930, the company has agreed to pay rental at the rate of $65,000 per month so long as the present lease remains in effect. In other words, the consideration to the city for the use of its subway through the experimental period of nineteen months was adjusted at the sum of $475,000 and amortized over a period of thirty months. Having thus provided for payment of these back rentals the parties have agreed that, in addition thereto, the company shall pay rent at the rate of $65,000 per month from the date of the lease to its termination.

From these references to historical facts and the contents of the lease it is apparent that the questions involved on this appeal are, (a) whether there was sufficient competent evidence before the commission

to support its conclusion that the municipal authorities (charged as they were with the duty of seeing that the taxpayers received for the use of their property as high a rental as the company could reasonably be expected to pay, having regard to its obligation to render adequate service to the public at reasonable rates,) did not make an improvident bargain, and (b) whether the commission excluded competent evidence relevant and material to the issues before it. It may be proper to note, in passing, that the questions whether the cost of the subway was excessive and whether the city should operate it itself were not before the commission; nor was any question raised relative to the power of the city to make this lease: cf. City Club of Phila. v. Pub. Ser. Com., 92 Pa. Superior Ct. 219.

The evidence received by the commission, as printed on this appeal, covers approximately four hundred pages and includes a number of exhibits. The northern section of the subway had been in operation twenty-two, and the southern two, months when the rentals were agreed upon, and the parties had before them extensive data compiled by the Broad Street Subway Conference Board (consisting of ten members, four appointed by the commission and three, each, by the city and company), by the Department of City Transit and by competent engineers and accountants appointed by the mayor and council. Among the exhibits admitted was the applicants' Exhibit No. 5, which, under the heading ''Table B,'' contained a summary of the results of operation from the date of the company's original occupancy down to the date of the present lease, with the exception of the month of June, 1930. The tables of receipts and expenses reflect the results of the operation of the subway alone, without relation to other parts of the company's system, and the operating expenses shown do not include overheads or

management fees. The director of city transit testified that the tabulations had been prepared and checked by the Department of City Transit from reports of the Broad Street Subway Conference Board. It is shown by this exhibit that for the months of September, October and November, 1928, (the period during which the first lease was in effect) the total gross receipts of the company were $464,137 and its operating expenses $369,673, making its net receipts for the period $94,463. During these months it paid into the city treasury rentals aggregating $600,000. Clearly, no operating company could long remain a tenant under such conditions. It further appears that for the eighteen - months period from December 1, 1928, to June 1, 1930, the total receipts of the company were $3,302,842 and its operating expenses $1,988,041, or an excess of receipts over operating expenses of $1,-314,800. If the full experience of the company in operating the subway from September 1, 1928, to June 1, 1930, be taken into consideration, the excess of receipts over operating expenses for that twenty-one months period was $1,409,263. Out of this it has already paid the city $600,000 under the lease for the first three months, and under the terms of the present contract will pay an additional rental of $450,000 ($25,-000 per month for eighteen months) or a total of $1,-050,000. This amount is within $359,263 of its total net receipts for the entire period.

The contention of appellants that the city has improvidently compromised a claim of more than $3,000,-000 against the company for $475,000 is based, as we understand it, upon the fact that the exhibit shows the total gross receipts of the company for eighteen of the nineteen months intervening between the termination of the first lease and the effective date of the present contract to have exceeded $3,000,000. It is argued that the occupancy and operation of the subway by

the company during this period was illegal and that its entire receipts, regardless of its operating expenses, should therefore be paid into the city treasury. In our opinion, there is no merit in this contention; the company was not a trespasser; it entered as a tenant of the city under the lease of 1928 and its entire occupancy has been that of a tenant; all the owners of the subway are entitled to receive for the use of their property during the experimental period is a fair rental. On that question there was evidence that during that eighteen-months period the excess of receipts over operating expenses varied from $44,846 for August, 1929, to $95,875 for January, 1930, and that the average for the period was slightly more than $73,000 per month. If the entire twenty-one-months period subsequent to September 1, 1928, be considered, this average would be $67,000 per month. During this latter period the company, as stated, has paid $600,000, and will, under the contract, pay an additional $450,000 as rental, making an average monthly rental of $50,000. There was therefore competent evidence upon the record to support the conclusion of the commission that rentals at the rate of $25,000 per month for the retroactive term of the lease, and $65,000 per month for its prospective term, were fair to both parties to the contract. It may also be observed that if there should be a material increase in the net receipts of the company prior to December 31, 1932, the city has the means to protect itself by giving notice of its intention to terminate the present lease in accordance with its terms.

As to the exclusion of offers of evidence, the record discloses that the city solicitor offered before the sitting commissioners the detailed monthly reports of the conference board. After showing that at the instance of the city controller and under the supervision of Dr. Milo Maltbie an audit had been made of the books

and accounts of the company, covering the period of the original lease, and of the working papers in the city transit department for the ensuing eight months, appellants offered the report and proposed to support it with Dr. Maltbie's testimony. Both offers were admitted tentatively by the sitting commissioners, subject to a ruling by the whole commission. By an interim report and order, dated November 25, 1930, the commission excluded both offers upon the ground that neither was relevant or material, but directed the company to submit certain data requested by one of the protestants. Appellants have printed the Maltbie report; it is an interesting disquisition upon factors which, in the opinion of its author, should be taken into account in framing a lease. There is no definite suggestion that the figures in "Table B" are not correct so far as they go. Criticism is made of the manner in which gross receipts were calculated, in that the figures do not take into account sufficiently the number of passengers riding on transfers, but it is stated no traffic studies were available. Under the head of operating expenses, it is suggested the estimate for "injuries and damages" is excessive by approximately $5,000. The report is mainly a discussion of the effect the operation of the subway has had upon the net income from the company's entire system of transportation. The writer propounds, and states his answer, to these somewhat academic inquiries: "Should the company be reimbursed for all the business which the subway may divert from parallel or competing surface and bus lines? Should any decrease in the net income of the company which may be traceable to the operation of the subway be paid for by the city? Has the company a right in law or equity to have preserved to it the net income it had before the operation of the subway was begun? Is there a moral obligation upon the city to protect such income against competition

by rapid transit lines which the city builds or causes to be built?'' The report covers only eleven out of the twenty-two months in question and Dr. Maltbie's conclusion was that the ''operating results'' for these eleven months ''are of limited value in determining the terms of an agreement for the operation of the subway for any considerable period.'' After an examination of the offer we cannot say the commission erred in excluding it from the record as immaterial to the issues before it.

Appellants also complain of the refusal of the commission to admit in evidence the record of certain proceedings then pending in the Court of Common Pleas No. 1 of Philadelphia County, No. 2827, September Term, 1929, which, as they contend, ousted the jurisdiction of the commission. From their brief, and from the statements made at the oral argument, we understand the proceeding was in equity at the instance of the city and its controller against the company (and its allied interests) praying, inter alia, for an accounting of money alleged to be due the city from the company by reason of the operation of the subway.

The commission did not finally dispose of the application for the approval of the lease until after the adjudication had been filed by the court. It is apparent from the paragraph of the adjudication read during the oral argument that the commission in no way usurped the jurisdiction of the court. After referring to the claim of the city for an accounting of the $3,000,-000 of gross revenue received by the company subsequent to the termination of the original lease and reviewing the history of the operation of the subway, the court, inter alia, said: ''This court has neither the authority nor the facilities for determining what is a proper rate of fare, or rental, for the operation of the subway, and it has no more right to restrain the Public Service Commission in the exercise of such

jurisdiction than the Public Service Commission has a right to enter into the disposition of an equity proceeding.''

The final complaint of appellants is that paragraph twelve of the lease, by providing that the company shall furnish to the director of the department of city transit such reports and data with respect to operation as may reasonably be required by him and permit him to have access to its books and accounts, in effect permits the company to ''evade its legal obligations'' to account to ''the controller of the city and county.'' It is contended that the controller is required by statute to audit and settle all accounts wherein the city or the county is a debtor or creditor. It is sufficient to say that the insertion of the paragraph complained of cannot take away any power vested by statute in the controller. Obviously, the paragraph is intended to afford the director of the department of city transit full opportunity to obtain detailed information relative to the effect upon the company's revenues of its operation of the subway, both as a separate unit and as a component part of its entire system.

For the reasons herein set forth we are satisfied, upon a review of the entire record, that the order appealed from is reasonable and in conformity with law.

The appeal is dismissed and the order affirmed at the costs of appellants.