Scranton-Spring Brook Water Service Company *v.* The Public Service Commission of the Commonwealth of Pennsylvania.

204

Argued November 16, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Stadtfeld, JJ.

*Ellis Ames Ballard* of *Ballard, Spahr, Andrews & Ingersoll,* and with him *Berne H. Evans* of *Hause, Evans & Baker,* and *William M. Wherry* of *Wherry & Wight,* for Scranton-Spring Brook Water Service Company, appellant.

*Joseph F. Gunster,* and with him *John H. Bigelow, M. W. Acheson, Jr., C. B. Little, Edwin B. Morgan, Michael F. McDonald, W. H. Gillespie, John H. Dando, Paul G. Smith* and *Frank L. Pinola,* for City of Scranton, City of Wilkes-Barre and City of Pittston, appellants.

*Wm. A. Schnader,* Attorney General, and with him *Harris C. Arnold,* Deputy Attorney General, amicus curiae.

PER CURIAM, May 4, 1932:

Scranton-Spring Brook Water Service Company, hereinafter referred to as the company, filed a new tariff increasing its rates, effective July 1, 1928. Sixty-nine complaints against the rates were filed; they were consolidated by the commission and were heard together. Among the complainants were the City of Scranton, the City of Wilkes-Barre, and the City of Pittston, hereinafter referred to as the cities.

As complaints were filed before the effective date of the tariff, the burden of proof of the reasonableness of the rates was on the water company. Voluminous testimony was taken, the record being the largest that has ever been considered by this court. A report and

order were filed by the commission, December 9, 1930, and were followed by two supplementary orders, one dated January 27, 1931, and the other, February 2, 1931. By an interim report and order dated December 21, 1928, the commission ordered reductions in rates to domestic consumers totaling approximately $245,000 annually. In its final report the commission fixed the fair value of the company's property for rate making purposes at $43,650,000 and allowed it a seven per cent return thereon, found that the existing rates were excessive, unreasonable and unduly discriminatory as against domestic consumers, and ordered the company to file a new schedule reducing its gross annual revenue to an amount not in excess of $4,219,000.

From the final order, as supplemented, we now have four appeals, one by the company and three by the cities.

On the petition of the commission filed February 19, 1931, it was ordered that the appeals be argued together and that the time for argument be postponed from the week of March 9, 1931, when the cases would have been reached for argument, to the week of April 20, 1931. Later, on March 19, 1931, the cities filed a petition setting forth that the recent death of their chief counsel, and the consequent impossibility to prepare for the argument at the early date fixed, required postponement of the argument to the October Term of the court to be held at Philadelphia; the commission assented, but the company opposed the application. The court granted the petition and the appeals were placed on the docket for argument at Philadelphia during the week of November 16, 1931; they were argued on November 16, 17, and part of November 18, 1931. All the judges of this court who sat at the argument are in complete agreement with what is stated in this opinion.

The appeal of the company is based on the proposi-

tion that the order violates the due process clause of the fourteenth amendment. The appeals of the three cities agree in complaining that the rates fixed were unreasonably high, and the City of Wilkes-Barre further complains that the rates fixed for consumers in that city, or in the Spring Brook district, are unjustly discriminatory.

In view of what is to be stated in this opinion concerning the record generally, and of the conclusion reached, it is unnecessary separately to discuss the appeal of the company. It is well settled that whether the order of the commission violates the due process clause of the fourteenth amendment, as the company contends, depends on facts—the value of the property, the rate and their relation. Whether the rate is unreasonable, as the cities contend, also depends on facts.

The Act of June 12, 1931, P. L. 530 requires this court, in considering the appeals of the complainants below, " . . . . . . to consider the entire record of the proceedings before the commission, including the testimony, and, on its own independent judgment, to determine whether or not the findings made and the valuations and rates fixed by the commission are reasonable and proper. If the court shall determine that the findings or the valuations are unreasonable, or that the rates fixed are unreasonably high, it shall remit the case to the commission with directions to reform the findings, valuations, and rates in accordance with the court's opinion."

Prior to that statute, if the only complaint was that a rate was unreasonably high, this court could only inquire whether there was sufficient competent evidence to support the order: Lewistown Borough v. Pub. Ser. Com., 80 Pa. Superior Ct. 528, and cases there cited. This court then had not been authorized in such cases to make independent findings of fact and to substitute them for those of the commission. It is

obvious, therefore, that the Act of 1931 has made a very radical change in the method of establishing rates and for the review of a rate order. The statute has thus produced not only a change in the function of the court in reviewing the record but also, of necessity, an important change in the manner in which the commission must perform its duties in such cases. It is but fair to say here that the report before us was prepared by the commission before the statute was passed, but, as the statute expressly provides that it shall govern existing proceedings, it must be so considered.

It is essential that the report of the commission, or the record, in some way disclose precisely the elements involved and the processes and methods by which the commission reaches its findings and conclusions on the evidence. The importance of revealing this and the necessity for it have frequently been declared by the courts, not only in proceedings dealing with reports of commissions, but generally; rule 58 recognizes it and the equity rules show that it is at the foundation of review in equity practice. It is not only of value to the courts but it is essential that counsel for the parties should have the information for the purposes of determining whether further proceedings should be had and how they should be conducted. In Beaumont v. U. S., 282 U. S. 74, 86, it is said: "The general statements in the reports to the effect that the commission in reaching its conclusions considered all the pertinent evidence add nothing to the prima facie presumption that generally attends determinations of the commission: Bluefield Co. v. Public Service Commission, 262 U. S. 679, 688-689.

"The commission's failure specifically to report the facts and give the reasons on which it concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to a matter essential to the case and imposes unnecessary work upon the courts called upon to consider the

validity of the order. Complete statements by the commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this: Wichita R. R. v. Public Utilities Commission, 260 U. S. 48, 58. And we have recently emphasized the duty of such courts fully to state the grounds upon which they act [citing cases]." See also Fitzsimmons v. Robb, 173 Pa. 645; Wilson v. Pub. Serv. Com., 103 Pa. Superior Ct. 558; Utilities Com. v. Springfield Gas Co., 291 Ill. 209, 233.

Ever since the creation of the commission, it has been its duty to make such "findings" as will support the final conclusion reached by it. "It is not a mere machine to record figures placed by witnesses," as their estimate of the value of items of physical property devoted to the service of the public, and then reach a conclusion somewhere "between the highest and lowest on the basis of a fair average": Erie City et al. v. Pub. Ser. Com., 278 Pa. 512, 529. Nor may the commission content itself with making lump sum valuations. "Lump sum or partial lump sum values are unfair both to the public and the utility where they represent the composite of a number of items entering into it. The commission's findings need not set forth the value of each separate piece of property, but there are standard classifications entering into the rate base recognized in the many decisions of the Supreme Court of the United States, particularly noted in the dissent in the Southwestern Bell case. With the engineering force and assistance at hand, we see no reason when facts are presented and determined, why they should not appear under the different classifications at least with sufficient clarity that the courts may know the parties vitally interested have not been unfairly dealt with": Erie City et al. v. Pub. Ser. Com. (529), supra.

As stated in that case, a report of the commission

"should be self-sustaining, answering in a large measure the relevant contentions of the respective parties." If we are to determine whether or not the "findings" are reasonable and proper we must have definite and specific findings to consider. There is no presumption, upon these appeals, in favor of the final conclusions as to value reached by the commission upon any particular item or classification of items of physical property or as to overheads. Nor does a statement by it that it has given due consideration to the respective contentions of the parties and, after considering all the elements entering into the problem, has arrived at a certain conclusion furnish any basis for a review of its conclusions. Where the evidence is conflicting we must be able to determine from the report what evidence the commission considered credible, and therefore worthy of adoption, and what evidence it rejected.

The report of the commission, when considered in connection with the voluminous record, is wholly inadequate to furnish to this court, or to any higher court that may be called upon to review the record, the detailed information necessary to understand how the findings made and the valuation and rates fixed by the commission were reached; this report does not furnish that assistance which the courts are entitled to have for the purpose of determining whether the findings, valuations and rates are reasonable, or the valuations unreasonable and the rates unreasonably high, within the meaning of the statute.

Both the cities and the company have adopted as an index of fair value for rate making purposes the reproduction cost of the property at present day prices, less the accrued depreciation upon the depreciable items. The commission fixed the depreciated reproduction cost of the company's physical property at $33,-187,571 and the overheads at $10,123,000.

Referring for the present to physical property only, we find in the report a "summary of appraisals of

physical property as finally adjusted from the record.''
In this summary the property is divided into twenty-seven classifications, beginning with ''real estate, rights of way and water rights'' (upon which there is no depreciation), and concluding with ''other general equipment.'' In parallel columns in this exhibit the commission has arranged, first, the figures contended for by the company as representing the reproduction cost, both new and depreciated, of the physical property included under each of the above mentioned twenty-seven classifications; next, the figures which the cities contend correctly represent that cost of the same property; and, finally, the figures arrived at by the commission as its findings of reproduction cost, new and depreciated. To illustrate, with respect to the first classification the company contended that the cost of its ''real estate, rights of way and water rights'' should be estimated at the sum of $5,562,246; the cities' contention was that the estimate for this property should not exceed $1,286,640; the commission adopted a figure of $3,781,456. In other words, there was a difference between the company and the cities of $4,275,606 on this one classification out of twenty-seven classifications involved. The commission did not agree with either of the contending parties but fixed the reproduction cost of these items at $3,781,456. The company's claim for the total of the twenty-seven classifications appearing in the summary (less depreciation on twenty-six of them) was $39,976,705; the cities conceded only $19,586,596. There was therefore a difference of more than $20,000,000 between the parties on the question of the reproduction cost of the company's physical property. The final conclusion of the commission was that the depreciated reproduction cost of this property was $33,187,571. It, therefore, reduced the figures submitted by the company $6,789,-134 and increased those submitted by the cities by $13,600,975.

If the summary be considered as a whole, it may be said that of the more than $20,000,000 difference between the parties over $18,000,000 thereof may be attributed to differences with relation to seven out of the twenty-seven classifications. They are as follows:

| No. | Account | Difference |
|---|---|---|
| — | Real Estate, Rights of Way and Water Rights | $4,275,606 |
| 208 | Impounding Reservoirs | 4,083,620 |
| 212 | Collecting Reservoirs and Intake Wells | 743,438 |
| 214 | Aqueducts and Supply Mains | 2,140,821 |
| 246 | Transmission Mains | 1,070,942 |
| 247 | Tanks and Stand-pipes | 2,060,332 |
| 248 | Distribution Mains | 4,109,574 |
| | Total | $18,484,333 |

It is stated in the report that Scranton-Spring Brook Water Service Company is the result of combinations of over one hundred water companies and that the entire territory served is somewhat over seventy miles in length in the Lackawanna and Susquehanna River Valleys, with a population of 650,000 persons. The system is divided into two large divisions, the northern or Scranton, in which the service is largely metered, and the southern or Spring Brook, where the consumption is generally upon a flat rate basis.

We will illustrate the difficulty we find in dealing with the record by reference to the items specified above as controlling. Immediately preceding the "summary of appraisals," the commission, after stating that "material differences of opinion" existed as to the unit costs for masonry and concrete in dams and reservoirs, widths of trenches, costs per foot for excavating and filling, laying of pipe, etc., continued: "It has been necessary in order to reach an estimate of the cost to reproduce these physical structures to examine separately the features of each one of them

and to compare the various estimates of the parties for each unit of construction in each of the four territories of respondent's system, in so far as the varying methods applied permit of such comparison. The commission has in each case studied their bases of calculation and has reached a conclusion on each item. The resulting figures have been carried into the total estimate for the property in each of the separate accounts in which it is habitually carried. Each of these calculations is largely independent and no real purpose can be served by extending the length of this report to state the finding on each separate component unit of property in addition to the general observations which have been made. The total for each account appears in the following table, made part of this report.''

This court cannot be certain whether that language refers merely to the differences of opinion referred to in the paragraph of which it is part, or whether it refers to all the findings. If the commission has the details, as that statement may imply, this court and the parties should have them.

As noted, the first classification in the ''summary of appraisals'' is thus stated: ''Real estate, rights of way and water rights. Respondent $5,562,246 ...... Complainants $1,286,640 ...... Commission $3,781,-456.'' We have no way of knowing how that total was made up. When we come to examine the evidence in order to form our judgment as to that finding of the commission we are hopelessly at sea without detailed discussion by the commission of how it arrived at the ultimate conclusion announced; as the commission states that it has reached a conclusion on each item, the court and the parties should be furnished with it. The record shows that the company's evidence on the subject in the Scranton district was obtained by furnishing three witnesses with maps showing the company's real estate, rights of way, and

water rights, and with the deeds or other evidence of title for the property; these witnesses say that they spent twelve days going over the property in the Scranton district,—about 50,000 acres of land,—divided it into zones and, generally speaking, put a unit value per acre on the property in each zone. They made a report of these unit values to the Public Works Engineering Corporation of New York. This report occupies twelve pages in volume 4 of the exhibits. The evidence goes on to state that the Public Works Engineering Corporation then applied the unit values to the acreage, and, by another exhibit occupying many pages, so arrived at the valuation of the land, rights of way, and water rights in the Scranton system as $3,854,327; that total was modified in other parts of the evidence by correction.

A different method was pursued by the company in submitting the valuation of the land and the same class of property in the Spring Brook territory. Three other witnesses submitted a written report on that property to the Public Works Engineering Corporation in 1927, stating the total value of the land in some fifteen parts, comprising 31,009 acres, as $1,405,324.

The cities also produced an appraisement. Their witnesses required several months of preparation. The witnesses, who gave the figures on both sides, were subjected to examination and cross-examination with respect to their conclusions. Some of the witnesses were obliged to admit that they had made serious mistakes, and it is very clear to us that in many cases this court cannot accept the conclusions of the witnesses. The only information the commission furnishes for our assistance on this subject is the bald statement already quoted. It is essential to this court, and any other court that may review the record, to have the appraisement or valuation on each item of land, rights of way, and water rights made by the commission, or, at least, information sufficiently detailed

to enable the court to consider the evidence in the light of the investigation made by the commission. This ought to be important for another reason: it is obvious that a commission that is constantly dealing with subjects of this class, and is equipped with an investigating force such as it is authorized to have, should be more competent to deal with this problem than a court, perhaps without the qualifications of the commission, and certainly without its working force, and without authority to obtain one. The company is entitled to have the value of its property considered, and that means all its property used and useful; the cities are entitled to see that such property is not considered at more than its value, and, as long as it is the duty of this court to make independent findings, all such property must be considered by the court, and the commission must furnish to the court its valuations in detail, together with the reasons for its conclusions, in order that the court may comply with the statute.

Other important classifications of physical property are those under which the various kinds of pipe lines have been assembled. The report states that in the Scranton division there are 110 miles of "aqueducts and supply mains" and 403 miles of "distribution mains." In the Spring Brook or Wilkes-Barre division, there are twenty-seven miles of "aqueducts and supply mains" and 573 miles of "distribution mains," making, as we understand the report, 137 miles of "aqueduct and supply mains," account No. 214, in which, as above stated, there is a difference of $2,140,821 between the parties. The aggregate of the "distribution mains," account No. 248, is 976 miles, with a difference of $4,109,574 between the parties, and 102 miles of "transmission mains," account No. 246, with a difference of $1,070,942. The two important unit prices involved in fixing a fair value for these three classifications of mains are the basic price per ton for cast-iron pipe, delivered at Scranton and Wilkes-Barre,

and the price, per hour, for common labor. A variation of even one dollar per ton for pipe or ten cents per hour for labor would make a very material difference in final results, especially when we note that 1,215 miles of mains are under consideration. As to pipe, the report states definitely that the commission adopted a base rate of $38 per ton, "with proper increases for smaller sizes and weights of pipe."

Upon a review and consideration of the evidence on both sides, and having regard to the admissions of witnesses for the company, our independent judgment is that the basic rate for pipe should be $36.25 per ton.

With regard to labor costs the commission said: "Respondent contends that a base price of 50¢ per hour for common labor should be used in all calculations involving labor costs; complainants' corresponding figure is 40¢. Considerable testimony appears of record as to prevailing prices for labor in the Lackawanna and Wyoming Valleys over a period of years as paid by municipal authorities, individuals, contractors and others, including this respondent." This is merely a statement of the contentions of the parties and there is no finding with respect to the rate per hour adopted by the commission. It is asserted in the cities' brief that "the commission used 50¢ as its cost for ordinary labor."

In the absence of any distinct finding we cannot assume the correctness of this statement; but, if the commission did use that rate, our judgment, after reviewing the evidence on the subject, is that it was too high.

Another important factor is the actual depth of the trenches. As to this the commission merely said: "Considerable question was raised as to the actual depth of the trenches in respondent's transmission mains, and testimony was produced by complainants to the effect that the cover over the pipe as estimated did not actually exist. The commission has given care-

ful consideration to this testimony and has reduced the depth claimed to what appears to be the actual depth as indicated by the record. Similarly, in the matter of paving over distribution and transmission mains and elsewhere, the commission has accepted the price which the record indicates respondent is actually compelled to pay the municipalities involved. Service lines have been included only in so far as they have been constructed by respondent.''

Here, again, we have no distinct finding as to the figures used by the commission—merely a general statement comparable to the other statements to which we have alluded.

After determining the reproduction cost of the physical property, depreciated, the commission added nine items for overheads, as follows:

| | |
|---|---:|
| Omissions and contingencies, | $ 960,000 |
| Engineering, superintendence, etc., | 1,396,000 |
| Promotion and organization, | 627,000 |
| Administration and legal, | 485,000 |
| Insurance and taxes, | 313,000 |
| Interest during construction, | 1,342,000 |
| Working capital, | 500,000 |
| Cost of financing, | 1,900,000 |
| Going concern value, | 2,600,000 |
| Total, | $10,123,000 |

The evidence adduced by the company, on which these allowances towards the fair value of its property used and useful in the public service were based, did not, with the exception of working capital and going concern value, deal with valuations in concrete amounts, but with percentages on the reproduction cost of the physical property, the theory being that in reproducing the physical plant certain intangible expenses would necessarily be incurred, which could best be measured by a percentage of the physical cost, and which must be added to the reproduction cost, depre-

ciated, of the physical plant to arrive at the present fair value of the property. Thus, in making up its valuation, the company added to the reproduction cost, depreciated, of the physical plant, exclusive of land, seventeen per cent to cover these intangibles, divided as follows: organization, two per cent; engineering and supervision, five per cent; taxes during construction, one per cent; interest during construction, six per cent; omissions and contingencies, three per cent; while the cost of financing was fixed by the company, in its valuation, at four per cent on the reproduction cost, new, of the physical plant undepreciated and including land, increased by the addition of the seventeen per cent just mentioned to cover the intangibles referred to and by the working capital claimed to be necessary to conduct operations. Both of the company's outside supporting engineering witnesses likewise calculated these intangibles by percentages on the physical plant, although in Mr. Jacobs' testimony the percentages used by him were not stated. It follows that the amount to be allowed for such intangible costs depends on two factors, (1) the value of the physical plant used in the calculation, and (2) the percentage rate used. They vary with the base cost adopted and the rate per cent employed. The commission has not stated what base cost it used in calculating these overhead intangibles—whether or not it was the adjusted amount shown in its appraisal of the physical plant— or the percentage applied to each of the several items. Applying the percentages claimed by the company, as above, to the reproduction cost depreciated, as arrived at by the commission, we find that the "organization" expenses of two per cent., calculated on $33,187,571, less land $3,781,456, or $29,406,115 would be roughly $588,000, whereas the commission has allowed for the same item, divided into "promotion and organization" and "administration and legal," $1,112,000, or an excess of $524,000 over the amount derived by applying

the rate claimed by the company to the lower adjusted base cost. As to the item, "cost of financing," this was fixed by the company at four per cent on the undepreciated value of the physical plant, including land, plus seventeen per cent for intangibles and working capital. On a valuation of $48,990,000 (including seventeen per cent intangibles), plus working capital of $839,000 which the company claimed in its calculation, four per cent would amount to $1,993,000, which was the figure used in its valuation. The commission's allowance of $1,900,000 would be four per cent on $47,500,000 and, deducting $500,000 working capital, as fixed by the commission—if that was included—leaves $47,000,000 as the valuation base used. But the commission's adjusted reproduction cost, new, of the company's physical plant was only $34,838,354 and, adopting the method of calculation of the company, and adding the prior intangibles as fixed by the commission, less the excess above noted, and working capital allowed by the commission, would give a base of only $39,837,354, four per cent of which would be slightly less than $1,600,000 as against $1,900,000 allowed by the commission, or an excess allowance of $300,000 over the amount obtained by calculating the percentage claimed by the company on the base as adjusted by the commission.

The item of going concern value is on a somewhat different footing. We have treated this subject at some length in City of York v. Pub. Ser. Com., 85 Pa. Superior Ct. 139, 142; Newport Home Water Co. v. Pub. Ser. Com., 76 Pa. Superior Ct. 386, 395; Ben Avon Borough v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561; Beaver Valley Water Co. v. Pub. Ser. Com., 76 Pa. Superior Ct. 255, 269, and other cases, and need not repeat what is there said. Unlike the other intangibles allowed, it is not wholly a theoretical matter, but must be supported, when allowed, by evidence of an actual lag in the early years of business, which should

be allowed for in arriving at the rate base. When that evidence is furnished, calculations are then in order to determine as nearly as possible the present allowance for such developmental cost. As President Judge Trexler said for this court in City of York v. Pub. Ser. Com., supra (where we disapproved any allowance for going concern value), "Some corporations have years of tedious waiting until they get on a paying basis; others have an immediate public demand and a profitable return as soon as started. Some fact must disclose to which class the particular corporation under consideration belongs. Before we figure going concern value, we should have such evidence that there was a lag before the business became established." In this case the company produced no evidence whatever of any lag in building up its business. The cities on the contrary produced evidence that the water companies combined in the present system were unusually successful from the start, with no lag in business or period of waiting until they got on a paying basis; that, starting with small capital invested, the earnings were so great and so immediate that the present great system had been built up out of such earnings put back into the business, after the payment of generous dividends.

In the absence of any evidence as to an actual or historical lag in the building up of business, the calculations of the company's engineers, based wholly on a theoretical lag, are insufficient to support an allowance for "going concern value," and the report of the commission, beyond the general statement that it has given consideration to the conditions to be met in the construction of such a property in the territory in which the company operates, presents no sufficient basis for the allowance of $2,600,000.

Ordinarily, it should be possible for engineers to agree upon an inventory of the physical property

owned by a public utility, or at least a large part thereof; questions relative to the number of feet or miles in a pipe line, the quantities of concrete, masonry, etc., in a reservoir, and the like, are questions of fact upon which experts should be able to agree. Physical property either does or does not exist and certainly this court should not be expected to determine from conflicting evidence the length of a pipe line, the depth or width of the trench in which it is laid or the number of cubic yards of masonry or concrete in a reservoir. Whether a given item of physical property is used or useful in the rendition of service to the public is a question upon which courts may properly be called upon to pass and upon which disagreement may be expected.

The evidence in this case indicates that the parties are not in accord even upon an inventory of the physical property as a basis for the making of estimates of its reproduction cost. Upon this subject the report reads: ''Respondent's evidence as to the property of that company is based largely on an inventory of physical property as contained in a report made in 1918 by the engineering staff of this commission under the immediate charge of the then Valuation Engineer (Downs), now in private practice, who when called as a witness by respondent, was positive that the descriptions of property used in the appraisal of 1918 were derived from complainants' witness, then the Chief Engineer of the company. The present appraisal used by the complainants is based on entirely different facts and costs in many particulars, and while their witness denies that the items of inventory contained in the former appraisal came from him the commission is not satisfied that that appraisal was not fair, reasonable and accurate when made. During the course of the hearings in the case various corrections and adjustments in the appraisals of the parties have been

made so that the figures as contained in the several exhibits are subject to modification and adjustment."

Again we have no specific findings by the commission as to what disputed units of physical property it included in its estimate of reproduction cost. Certainly it could not have been the legislative intent in enacting the amendment of 1931 that this court without the assistance of engineers or accountants, should, in reviewing a case "involving the reasonableness of rates," first of all be obliged to ascertain just what physical property the commission determined was used or useful in the public service and then discover for itself the quantities and unit prices which the commission finally adopted in reaching its conclusions.

Another important factor in this case is the deduction to be made from the reproduction cost new of the various items of property for the depreciation which has accrued thereon; the smaller the deduction, the larger the reproduction cost. In at least five classifications of the "Summary of Appraisals of Physical Property" the commission has deducted a smaller amount for accrued depreciation than the company conceded or the cities suggested. To illustrate, in account No. 215, designated "Other Collecting Conduits," the company conceded that, if its reproduction cost new of $798,073 should be adopted, $33,830 should be deducted therefrom for accrued depreciation on the items included under that heading. The cities contended that, if their reproduction cost new of $509,165 for the same items be accepted, $38,811 should be deducted. Although the commission determined that the reproduction cost new of this property was $689,-703 (a figure between those contended for by the respective parties) the amount deducted by it for accrued depreciation was not a figure between the accrued depreciation figures of the parties but only the sum of $9,243.

Similarly, in account No. 248, "Distribution Mains," the company conceded, on its basis of reproduction cost new, an accrued depreciation of $1,075,231 and the cities suggested, upon their reproduction estimates, an accrued depreciation of $1,198,602, but the commission fixed the accrued depreciation under this account at only $379,167. The result of these conclusions by the commission is, of course, to increase materially the depreciated reproduction cost over what it would have been if larger amounts, proportionate to the respective contentions of the parties, had been adopted by the commission. In account No. 248 this result is particularly apparent. Although the commission reduced the company's reproduction cost new from $10,-465,389 to $9,433,356 (a difference of $1,032,033), after the commission had calculated the accrued depreciation the depreciated cost fixed by it was $9,054,189 as against the company's conceded depreciated cost of $9,390,158, or a reduction of only $335,969. When attention was called at the oral argument to these inconsistencies, counsel on both sides were requested to file briefs upon the question of accrued depreciation in classifications Nos. 215 and 248. Counsel for the company correctly state in their brief that "the report does not disclose the method used by the commission," and frankly say they do not pretend to be "able to establish the method used by the commission"; they, however, submitted a series of calculations for the purpose of showing the manner in which the commission may possibly have arrived at its conclusions. The result in account No. 248 is, under one method, accrued depreciation in the amount of $202,817 and, under another, $339,601, neither of which comes within $40,000 of the figure adopted by the commission. Counsel for the cities, referring to the deduction made by the commission, say "this was done without any recital of the method or system adopted by the com-

mission. No one can tell how the conclusions were arrived at; whose testimony was accepted and whose was rejected.''

Clearly, we are entitled to know the method by which the commission reached its conclusions upon this important matter. What we have said applies, generally, to the inclusion in the estimate of allowable annual gross revenue of an item of $200,000 for ''annual depreciation.'' Whatever method may have been used, it should also appear that the allowance for annual depreciation bears a proper relation to the accrued.

Nor is it clear from the report just how the commission, on the figures stated therein, reached its final conclusion of $43,650,000 as the ''present fair value of the respondent's property for rate-making purposes.'' The depreciated reproduction cost of the physical property, as summarized in the tabulation, is fixed at $33,187,571; overheads are allowed in the aggregate sum of $10,123,000; the total of these items is $43,310,571. It is stated in the report that ''additions and betterments to the property since the date of the inventory have been allowed in the sum of $1,-340,888, as submitted by respondent.'' If this means that none of these additions has been included in the ''Summary of Physical Property'' the total of the figures would be $44,651,459.

Counsel for the company argued orally, and contend in their brief, that the commission made a mathematical error against it of $1,000,000 and, upon the commission's own figures, should have found fair value in the sum of $44,650,000.

Such conclusion by no means follows even upon the face of the figures used by the commission. Depreciated reproduction cost is only one of several indications of present fair value. It is quite within the range of possibility that the commission, after considering all the circumstances, was of opinion that the

present fair value of the company's property did not exceed $43,650,000. If this was its conclusion, the matter should not have been left to conjecture; the reason for reducing the figures should have been stated.

Counsel representing the cities in the Spring Brook system—Wilkes-Barre, Pittston, etc.—complain that the commission did not require the company to separate its schedules and apply one schedule to the Scranton district and another to the Spring Brook or Wilkes-Barre district, claiming that the plants and facilities of the two systems are separate, that separate appraisals or valuations have been made and that the more populous Spring Brook district can be supplied at less cost than the Scranton district, and should enjoy the resultant benefit.

While but one schedule has been filed it has, to an extent, the effect of a double schedule, at least as respects domestic consumers, for in the Scranton district the domestic consumers are practically all supplied by metered service, whereas, in the Spring Brook district, the domestic consumers are practically all supplied on a flat rate basis. Thus, so much of the schedule as relates to metered domestic service is a Scranton district rate, while so much as relates to a flat rate basis is largely a Spring Brook district rate. There is no requirement that all rates throughout a territory as large as this one, served by one company, must be the same. They must be reasonable and not unjustly discriminatory; one community may be unjustly discriminated against if it be required to pay substantially more than a fair and reasonable rate. The two systems have been and are so conducted that a check can be made by the commission as to the fair value of the property and the income and expenses in each district and, if it should be determined that the charges to the consumers in the Spring Brook district are substantially greater than they should be called on to pay,

an adjustment can be required either in the schedule filed or by requiring separate schedules to remove the unfair discrimination. The commission in its report made no finding or determination on this matter which was raised by counsel for the cities in the Spring Brook district in their brief and argument before the commission.

While no separate assignment of error has been filed directed specifically to the "service charges" contained in the schedule originally filed by the company, or the subsequent schedules filed pursuant to the orders of the commission, we are not to be understood as passing upon or approving the graduated service charge, ranging from $8 (or as reduced by the commission, $5), for a 5/8 inch meter, to $1,152 a year for an 8-inch meter, for the privilege of being served with water by metered service. We have, in the past, approved a reasonable charge for services covering the reading and examining of meters, billing customers and similar matters, which are common to every metered service and not affected by the size of the meter, but no sufficient reason has been advanced to us why there should be added some of the items and percentages stated on the exhibit (p. 1309) entitled "Service Charge."

The company in its appeal complains of the refusal of the commission to make allowance, in fixing the rates to be charged, for the expenses of this rate case, amortized over a period of five years. Whether such an allowance should be made or not will depend largely on the final outcome of the litigation. If the company's schedule of rates, as filed by it, is substantially sustained, allowance should be made for the reasonable expense—not necessarily the actual outlay—to which it was put in order to uphold it. On the other hand, if the schedule filed is decided to have been substantially greater than the just, fair and reasonable rates

it was entitled to charge, there is no reason why the public should be asked to bear the expenses of the litigation brought on by its filing a schedule of rates found to have been greatly excessive.

For the reasons stated, we are all of opinion that the report is so lacking in specific findings that it is impossible "to determine whether or not the findings made and the valuations and rates fixed by the commission are reasonable and proper."

We should add it is not to be inferred from what we have said of certain features of the report that we consider it otherwise sufficient; we now merely indicate to counsel and to the commission outstanding issues upon which we need specific findings before we can undertake the performance of the statutory duties imposed upon us in disposing of these appeals.

We must therefore remit the record to the commission with directions to make specific findings as to the property considered by it in fixing the rate base, and the quantities and unit prices adopted under the various classifications; also, to state the facts and methods on and by which it arrives at its conclusions concerning allowances for overheads, and the manner in which it calculates accrued and annual depreciation, and, generally speaking, for further action not inconsistent with this opinion.