[S. F. No. 15065. In Bank.—February 28, 1935.]

MIKE LANG et al., Petitioners, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

Sanborn & Roehl, W. H. Kessler, Clair W. MacLeod and Hugh Gordon for Petitioners.

Rex B. Goodcell, as *Amicus Curiae* on Behalf of Petitioners.

Arthur T. George, Ira H. Rowell and Roderick B. Cassidy for Respondent.

G. E. Duffy, E. E. Bennett, E. C. Renwick, L. N. Bradshaw, J. E. Lyons and R. E. Wedekind, as *Amici Curiae* in Support of Respondent.

CURTIS, J.—Some time prior to the ninth day of March, 1933, the Southern Pacific Company, the Atchison, Topeka and Santa Fe Railway Company, the Los Angeles & Salt Lake Railroad Company, the Pacific Electric Railway Company, the Western Pacific Railroad Company, the Sacramento Northern Railway Company, the Tidewater Southern Railroad Company, and the Pacific Freight Tariff Bureau filed in the office of the Railroad Commission of the state of California their tariff publications or schedules of rates to be charged by said companies for hauling or transporting petroleum, petroleum products, and kindred commodities named therein to and from various points in the state of California. The rates proposed to be charged for the transportation of said commodities were less than the rates theretofore charged by said companies for like services. On March 9, 1933, the Commission suspended the operation of said rates, and thereafter made further orders of suspension, the last of which carried the period of suspension up to December 10, 1933. The orders of suspension were made for the purpose of permitting an investigation by the Commission of the reasonableness of said proposed rates. This investigation was undertaken in the first instance by the Commission upon its own initiative, and later a large number of tank truck operators, including all of the petitioners herein, protested the approval of said proposed rates, and joined in said investigation in support of their said protest against said schedule of rates as proposed by the railroads. Said protestants, including the fourteen petitioners herein, are private carriers of petroleum products, principally gasoline, from refineries to distributing stations, and from refineries and distributing stations to garages and service stations. In addition to gasoline, various other petroleum products are transported by petitioners, such as smudge oil from refineries

to farms and ranches, road oil from refineries to construction jobs, fuel oil from refineries to customer's tank, and package goods to various destinations. Petitioners, with the other protestants, some time prior to the filing by the railroad companies of their new schedule of rates, had each filed a separate application before the Railroad Commission for a certificate of public convenience and· necessity to operate an auto-truck line for the transportation of petroleum and petroleum refined products between points in the state of California. These applications and the matter of the suspension of the schedule of rates filed by the rail carrier were consolidated and heard together. The hearing of these matters extended over a number of days, during which a large amount of testimony, both oral and documentary, was laid before the Commission. On final hearing the Commission, by order concurred in by three members of the Commission, denied the applications of the truck tank owners for ·certificates of public convenience and necessity, and vacated its several orders suspending the reduced rates on petroleum products, as set forth in the schedule of rates filed by the several railroad companies heretofore referred to. Thereafter the petitioners herein filed their petition for a rehearing of said matters. The Commission thereupon ordered that oral argument on said matters be made and fixed a day for hearing the same. After argument the Commission again made its order vacating its previous orders suspending said rates. The petitioners herein thereupon filed in this court their petition to annul that part of those orders of the Commission which vacated said orders of suspension. No attack is made upon that part of the orders of the Commission denying the applications of the tank truck owners for certificates of public convenience and necessity, so the validity of the orders of the Commission, in so far as they resulted in a denial of said applications, is not questioned in this proceeding.

The sole question, then, presented by the petition now before us concerns the action of the Commission in vacating the orders of suspension of the rates filed by the railroads, which vacating orders had the effect of fixing and establishing said rates as reasonable and valid rates to be charged by said railroad companies for the transportation of petro-

leum products by said rail carriers throughout the state of California.

As a background to the pending controversy between the rail carriers and the tank truck operators the record before the Commission, which by the order of the court has been brought before us for the purpose of review, discloses that up to the years of 1924 and 1925, the rail carriers enjoyed exclusively the business of transporting gasoline and other petroleum products in this state. Their service was not entirely satisfactory to some of the major oil companies, with the result that the oil companies induced various truck operators to equip themselves with tank trucks and to engage in the transportation of gasoline and other petroleum products. The rates agreed upon by the oil companies and the truck operators were substantially lower than those then charged by the rail carriers. The service of the truck operators was also more flexible and expeditious than that rendered by the rail carriers. This improved service and reduced rates, as a matter of course, caused a large volume of this business to leave the rail carriers and go to the truck operators, with the result that, at the time of the hearing of the matter before the Commission, the amount of this business enjoyed by the truck operators exceeded that of the rail carriers by at least 55 per cent. The truck operators built up a business representing an investment of over $2,500,000. The railroads, undoubtedly for the purpose of holding this business, improved their service and made sweeping reductions in their rates. This reduction in rates was promptly met by the truck operators. The business of the railroads continued to decrease and that of the truck operators showed a corresponding increase. Continuing their efforts to recover this business, the rail carriers, early in the year 1933, filed with the Railroad Commission the schedule of rates, the order for the suspension of which was vacated by the Commission and which is now before us for review. In the majority opinion of the Commission it is stated that, "The railroads feel that this particular business belongs to them, although they are now enjoying less than half of it. They are determined to regain it, to which end they earnestly seek to justify the lower rail rates under suspension. These rates are based on a scale of 8 cents per 100 miles, minimum 4 cents. According to the testimony presented at consider-

able length they can be reduced 69 per cent more before causing a burden on other traffic.'' On the other hand, the tank truck operators insist that they supplied a real need when rail service was unreasonably high and admittedly inefficient, and that the rail carriers should not be permitted to cut rates to a point which will practically eliminate the tank truck operators from the business of transporting the gasoline and other petroleum products of the state. The minority opinion supports the position of the tank truck carriers. The members of the Commission joining in that opinion favored the granting of the applications of the tank truck carriers for certificates of public convenience and necessity and adjusting the rates upon some equitable basis which would permit both rail and truck carriers to compete for this business upon terms fair and equal to both parties. But neither the minority members of the Commission nor the truck carriers suggest any method whereby such a solution of the problem can be accomplished. As we have seen, the truck carriers are private carriers. They do not operate over any regular route, nor between fixed termini. Their services are performed entirely through private contract. They have never dedicated their property to public use. The Railroad Commission has no jurisdiction over them, either in the matter of fixing the rates that they will charge or for any other purpose. (*People* v. *Duntley*, 217 Cal. 150 [17 Pac. (2d) 715] ; *People* v. *Lang Transportation Co.*, 217 Cal. 166 [17 Pac. (2d) 721] ; *Frost & Frost Trucking Co.* v. *Railroad Com.*, 271 U. S. 583 [46 Sup. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457].) The petitioners herein evidently concede that their legal status is that of private carriers, and that the Commission has no jurisdiction to fix the rates which they may charge for their services, as they have taken no exception to that part of the order of the Commission denying their applications for certificates of public necessity and convenience.

 Before proceeding to the consideration of those questions which concern the merits of this proceeding, we will answer certain objections in which the respondent attacks the right of the petitioners to maintain this proceeding. In the first place, the respondent contends that petitioners are mere interveners in the matter of the suspension of said rates, and that as such have no right to maintain this proceeding. We

do not so understand the position of the petitioners. While the Commission, upon its own initiative, suspended the operation of said rates, the record shows that thereafter the petitioners, and other tank truck carriers, protested the rates as filed by the rail carriers, and the matter was thereafter heard upon the protest of the tank truck carriers as well as upon the voluntary action of the Commission in temporarily suspending said rates. ■ But even as mere interveners they are made parties to the controversy (sec. 61a, Public Utilities Act; Stats. 1915, pp. 115, 158; Act 6386, Deering's Gen. Laws, 1931), and as such could petition for a rehearing (sec. 66, Public Utilities Act; Stats. 1915, pp. 115, 160, Act 6386, Deering's Gen. Laws, 1931), and upon its denial could apply to this court for a writ of review for the purpose of determining the lawfulness of said order. (Sec. 67, Public Utilities Act; Stats. 1933, p. 1157; Act 6386, Deering's Gen. Laws, 1931, as amended in 1933.)

■ Neither is there any merit in respondent's objection to the maintenance of this proceeding by petitioners upon the ground that the order of the Commission vacating said order of suspension was a negative order and therefore not subject to review. The order vacating the suspension of said rates was, in effect, an order approving and allowing the rates as filed by the rail carriers. It was, therefore, reviewable. (*McLean Lumber Co.* v. *United States*, 237 Fed. 460; sec. 67, Public Utilities Act, *supra*.)

■ With these procedural questions disposed of we will proceed to a consideration of the main controversy between the parties to this proceeding and that is whether the Railroad Commission has regularly pursued its authority in vacating the orders suspending the schedule of rates set forth in the tariff publications filed by the rail carriers with the respondent Commission.

Petitioners contend that the rates contained in the schedule filed by the rail carriers are unreasonable in that they do not and will not pay their full share of what are known as transportation expenses, and in this connection transportation expenses include all operating expenses and fixed charges, and in addition thereto, interest on bonded indebtedness and a reasonable return on the capital invested in the carrier service. They quote from an early decision of the Interstate Commerce Commission the following statement defining the

term "reasonable rate": "Rates cannot be said to be reasonable which are not reasonably remunerative to the carrier, and rates which do not pay their full proportion of operating expenses, fixed charges and reasonable dividends are not *per se* or 'in and of themselves', reasonably remunerative. . . . Traffic should be made, if possible, to pay its due proportion of operating expenses, fixed charges and reasonable dividends." (*Board of Trade* v. *Nashville, C. & St. L. Ry. Co.,* 8 I. C. C. 503, 524.) The principle announced by the Interstate Commerce Commission above is approved in the following decisions of the Supreme Court of the United States: *Board of Public Utility Commrs.* v. *New York Tel. Co.,* 271 U. S. 23 [46 Sup. Ct. 363, 70 L. Ed. 808]; *McCardle* v. *Indianapolis W. Co.,* 272 U. S. 400 [47 Sup. Ct. 144, 71 L. Ed. 316]; *Bluefield Co.* v. *Public Serv. Com.,* 262 U. S. 679 [43 Sup. Ct. 675, 67 L. Ed. 1176]; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19 [29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134]; *Smyth* v. *Ames,* 169 U. S. 466 [18 Sup. Ct. 418, 42 L. Ed. 819].

These cases, however, all involved proceedings in which some regulatory agency, like the Railroad Commission of this state, for instance, was attempting to impose maximum rates which a public utility claimed were confiscatory. The rule announced in those cases is entirely different from that governing cases where the carrier or other public utility is voluntarily offering the rates in question, as the railroads in the present instance are doing. This difference in the rules as applied to rates under these two different situations is pointed out by the Interstate Commerce Commission in the following excerpt from one of its opinions: "Where a rate imposed by a regulatory body is under judicial review upon the allegation that the rate fixed is confiscatory, it has been held by the courts that a rate may not lawfully be fixed by such tribunal which is based alone on the out-of-pocket costs ascribable to that particular traffic, but that to be lawful the rate must be sufficient to cover a ratable proportion of the average cost of freight traffic generally, including a return on the property devoted to public service. To hold otherwise would compel the performance of a certain specified kind of service by the carrier at less than average cost. The extension of this principle to other classes of traffic, if pursued far enough, would bankrupt the road.

"Where, however, carriers voluntarily propose to reduce certain rates to an out-of-pocket *plus* basis in order to augment the total traffic carried, a wholly different situation is presented. The menace of confiscation is absent, for *volenti non fit injuria;* and the additional traffic, if secured with a resulting augmentation of net revenue instead of laying a burden upon other traffic, affords the possibility of lightening the burden thereon by bringing a greater tonnage under contribution to net revenue.

"The criteria of a reasonably compensatory rate in a confiscation case are therefore essentially distinct from the criteria of a reasonably compensatory rate where carriers volunteer a reduction on certain rates to an out-of-pocket *plus* basis. In the first set of cases the carrier has presumably been charged with seeking to extract from the public which is served more than the services are reasonably worth; in the second set of cases the carrier is accused by protestants, not primarily of seeking to extort more than the service is reasonably worth to those who receive the service but of working undue discrimination as between those who can and those who cannot avail themselves of the lower rates voluntarily proposed." (*The Transcontinental Cases of 1922*, 74 I. C. C. 48.)

In a later opinion filed by the Commission this principle was reiterated in the following language: "We have repeatedly held that the carriers may, subject to certain restrictions, initiate rates lower than we may prescribe. The question is as to whether or not in this instance they are proposing to go to such lengths in attempting to meet competition and attract business that the resulting charges will be so low as to create a burden upon other traffic. In this connection cost figures have been submitted which, although tending to show that the proposed charges will probably not cover all costs if cost is to be ascertained by distributing all burdens over all traffic, do indicate that they will produce considerable return in excess of the direct out-of-pocket costs of the services. Whether the proposed reduction will result in a sufficient increase in business to more than offset the loss in revenue which it would entail on the amount of business which would be handled whether the reduction is made or not is of course a question to which only actual operation under the reduced charge can furnish a satisfactory answer.

In our judgment respondents have sufficiently justified the proposed reduction, and we so find.'' (*Handling Charges on Cement, Fertilizer, and Salt at South Atlantic and Gulf Ports*, 93 I. C. C. 640, 644, 645.)

No claim is made by petitioners that the rates fixed by the schedules filed by the rail carriers are not sufficient to more than meet all the actual and immediate costs of transporting said products, referred to by the Interstate Commerce Commission as the out-of-pocket costs. Upon that question the majority of the respondent Commission, speaking through Commissioner Carr, held as follows:

''It is not an exaggeration to say that in no instance since the writer of this opinion has been a member of this Commission have the rail carriers so fully and convincingly justified a rate under suspension as have the carriers justified the rates here under suspension. The history and development of rates on gasoline were displayed at great length, indicating a somewhat haphazard development of a rate structure for this class of traffic and the need for some stable and logical basis for the construction of the tariff. The suspended rates, it was shown, are constructed on such a basis. Evidence was presented in detail showing that rates heretofore in effect did not and would not retain this traffic and that in the absence of a comprehensive revision and reduction in rates the traffic would gradually leave the rails. Economic studies were presented on costs of moving the traffic and indicating the prospective earnings from the gasoline movement on the assumption that the suspended rates would attract back to the rails varying percentages of the movement lost. While it may be said that the course of the carriers in thus seeking to reduce rates on gasoline represents a somewhat daring exercise of managerial discretion and judgment, it cannot be said that the effort is hasty or ill conceived or without prospect of bettering the financial condition of the carriers. It would be a clear abuse of discretion for this Commission to permanently suspend the rates proposed.''

Neither the minority opinion nor the petitioners contend that this finding of the Commission in respect to the rates being more than sufficient to cover the out-of-pocket costs is not supported by sufficient and competent evidence. In fact, as we view the record, the evidence in support of this finding

is practically without conflict. It cannot, therefore, be held by this court that said rates are unreasonable. They do not cast an unreasonable burden upon other traffic. On the other hand, they afford some opportunity to the rail carriers of securing additional traffic, which will produce a net revenue and thereby afford an opportunity of lightening the burden on other traffic.

Petitioners make the further contention that the evidence before the Commission did not justify the conclusion that the rail rates in issue were necessary to meet truck competition. The evidence shows that the total number of tons of gasoline moved by rail in the year 1928 was 1,980,992 tons, and that there was a gradual reduction in this amount up to and including the year 1932, the year immediately preceding the filing by the rail carriers of their schedule of rates now under attack. In 1931 the number of tons of gasoline moved by rail was 1,263,411 tons, and in 1932 it was 967,118 tons. The percentage of this business transacted by the rail carriers in 1928 was 54.5 per cent. This percentage shows a gradual reduction until the year 1932. In 1931 it was 27.5 per cent, and in 1932 it had fallen to 21.7 per cent. On the other hand, this same evidence (Exhibit 5 attached to petition for review) shows that the amount of gasoline moved by applicants in 1928 was 597,899 tons and that this amount showed a gradual increase up to and including the year 1932, when it was 1,504,497 tons, while the percentage of this business handled by applicants increased from 16.5 per cent in 1928 to 32.1 per cent in 1931, and to 33.7 per cent in 1932. The balance of business of transporting gasoline in the state during these years was done by the water carriers and small truck operators not included among the petitioners. The highest percentage of business enjoyed by these small truck operators was 15.4 per cent in 1931. No figures are given as to these small truck operators for the year 1932. This evidence shows beyond question that the truck carriers not only were real competitors of the railroads for this business, but there was a gradual and steady movement of this business from the rails to the trucks. This was the situation in the early part of 1933 when the rates in issue were filed by the rail carriers. A tabulation of the rates, or at least a substantial portion thereof, charged by the railroads in previous years, together with those under consideration, has

been prepared by petitioners and set forth in their opening brief on pages 29 to 33, inclusive. This tabulation is too lengthy to set forth in full in this opinion, and for that reason we will only show the first five items thereof, which are typical of all others shown thereof. According to this tabulation the rates in effect for transporting gasoline per 100 pounds were as follows:

| From Richmond To | Rates in Cents per 100 Pounds in Effect | | | | |
|---|---|---|---|---|---|
| | Up to Nov. 10, 1926. | Up to Mar. 10, 1928. | Up to July 30, 1931. | Up to Dec. 16, 1933. | Under Consideration |
| Hollister | 25 | 25 | 19 | 9 | 7½ |
| Watsonville | 25 | 25 | 19 | 10 | 8 |
| Salinas | 29½ | 29½ | 22 | 10 | 8 |
| Paso Robles | 44 | 44 | 44 | 20 | 16 |
| Oakdale | 20 | 17 | 14 | 11 | 7 |

This tabulation shows that as a rule the prior reductions in rates were much more drastic than that effected by the present rates. Still they did not stop the movement of this class of business from the rail carriers to the truck owners. Confronted with this situation, the railroads were compelled either to concede this business to the trucks or make further reductions in their rates in an effort to retain what business they then had, and possibly regain that, or at least a part of that, which they had lost. The above evidence, in our opinion, was ample to justify the finding of the Commission that the rates in issue were necessary to meet the competition of the truck carriers.

"As the carriers are in.competition for the business they may, within the zone of reasonableness prescribed by the statute, adjust their rates so as to obtain or retain the desired traffic for their own lines (citing authorities). The theory of the Act is that the carrier in initiating rates may adjust them to competitive conditions." (*Texas & Pacific Ry. Co.* v. *United States*, 289 U. S. 627, 636 [53 Sup. Ct. 768, 77 L. Ed. 1410, 1421].) The same principle is approved in *Interstate Commerce Commission* v. *Chicago Great Western Ry. Co. et al.*, 209 U. S. 108, 112 [28 Sup. Ct. 493, 52 L. Ed. 705]. This has been the ruling of the respondent Commission in the following proceedings: *Southwestern Portland Cement Co.* v. *Atchison, T. & S. F. Ry. Co. et al.*, 38 Cal. R. C. 473, 477, and *Union Rock Co.* v. *Atchison, T. & S. F. Ry. Co.*, 27 Cal. R. C. 285, 296.

■ We are unable to perceive how section 15 (a) of the Interstate Commerce Act (U. S. Code, title 49) has any application to any question arising in the present proceeding. Its provisions are lengthy and we are not directed to any particular provision of this section which has been violated by the respondent Commission in its order vacating the suspension of said rates. If these rates are in conflict with rates fixed by the Interstate Commerce Commission for interstate commerce of the same character in this state, no showing has been made by petitioners indicating such conflict. Neither are we able to find anything at all helpful in the decision of the Interstate Commerce Commission rendered in the proceeding entitled, Rates on Refined Petroleum Products from, to, and between Points in the Southwest, 174 I. C. C. 745. It is contended by petitioners that in that proceeding it was held "that any interstate rate which was less than 75% of a maximum reasonable rate was not compensatory and burdened other traffic". We find no such ruling in that proceeding. We do find that under the particular facts in that case the respondents therein were awarded the right to establish "rates not less than 75 per cent of the scale herein approved, to meet competition of motor trucks and pipe lines carrying refined petroleum products". This is an entirely different proposition than that stated by petitioners. No attempt was made in that decision to establish a standard of interstate rates which in their relation to maximum reasonable rates would be controlling in all cases, or even controlling generally in cases of that character. The facts in that proceeding are so different from those now before us as to render that decision of slight if any assistance in the determination of the questions confronting us in the present proceeding.

Neither, in our opinion, has the National Recovery Act or section 500 of the Transportation Act of 1920, each of which is the result of federal legislation, any bearing upon any question involved in this proceeding. ■ We are not impressed with the contention of the petitioners and of *amicus curiae* that the decision of the Commission violates the Constitution of this state or the Constitution of the United States, in that it deprives the petitioners of their property without due process of law. Originally, as we have stated above, the business of transporting pe-

troleum products was enjoyed almost exclusively. by the rail carriers. The truck carriers later, by reduction of rates and other means, were able to divert a major portion of the business to themselves. The railroads are simply endeavoring to regain this business. If they succeed .they will do no more toward depriving the truck owners of their property than the latter succeeded in doing when they drew this business, or a large portion of it, from the railroads. In neither case has either party deprived the other of its property without due process of law, as this term is used in the state and federal Constitutions. ▮▮▮ Furthermore as this point was not urged before the Commission upon the hearing of the petition for rehearing, this court is precluded from considering it in the present proceeding brought to review the action of the Commission. (Section 66, Public Utilities Act, Stats. 1915, pp. 115, 160, Act 6386, Deering's General Laws, 1931.)

▮▮▮ We appreciate that whichever way this proceeding is decided, the result will work a hardship upon one or the other of the parties hereto. To permit unrestrained and unregulated competition to be carried on between the rail carriers on the one hand and the tank truck carriers on the other will be disastrous to both parties, and, it is conceded, will eventually result in the railroads driving the truck carriers out of this particular class of business ·and will to a large extent render worthless the large investment . of the truck carriers, now estimated to amount to over $2,500,000. On the other hand, to fix, or as the expression is often used in the record, to "peg" the rail rates, without regulating the rates to be charged by the truck carriers, and it is admitted that the Commission has no authority over the rates to be charged by the truck carriers, would permit the latter to cut under the rail rates fixed by the Commission, with the result that practically all of this business would leave the rail carriers and go to the truck carriers. The Commission appreciated the dilemma in which the carriers were placed and concluded that it was powerless to remedy the existing condition. The minority members of the Commission favored the fixing by the Commission of a differential in the rates, in favor of the rail carriers, that is, that the rates to be charged by the rail carriers would be less than those fixed for the truck carriers, as it was conceded that

on an equality of rates the rails could not hope to compete with the trucks. They admitted, however, that upon the record before them it was impossible to determine with any degree of certainty just the amount of such differential. But the more serious question, as it appeared to the majority members of the Commission and as it appears to us, is that any schedule of rates the Commission might fix would not be binding upon the truck carriers, therefore it would be an idle act for the Commission to attempt to adjust the differences between the two classes of carriers, when only one class would be bound by such arrangement, leaving the members of the other class to conform to it or violate it, as to their interest might seem best. Even if the Commission should grant the applications of the petitioners for certificates of public necessity and convenience, assuming that this could legally be done, and the truck carriers brought within the jurisdiction of the Commission and therefore subject to the rate fixing power of the Commission, that would not prevent other private truck carriers from springing up and fixing rates lower than those established by the Commission, and in that manner drawing this business away from both the petitioning truck carriers and the railroads. Until truck carriers are brought within the jurisdiction of the Commission and the latter is given power to fix rates to be charged by them, we see no way that the Commission can stabilize this business between them and the rail carriers. We are, therefore, in accord with the conclusion reached by the majority members of the Commission in vacating the orders of the Commission suspending the rates, as filed by the rail carriers, and in our opinion, the Commission in so doing regularly pursued its authority.

The orders of the respondent Commission vacating said orders of suspension are hereby affirmed.

Shenk, J., Waste, C. J., Thompson, J., and Langdon, J., concurred.