IN THE MATTER OF THE APPLICATION OF ARTHUR GORE, DOING BUSINESS AS KEMMERER BUS LINES, KEMMERER, WYOMING, TO INCREASE CERTAIN RATES, FARES AND PRACTICES.

ARTHUR GORE, doing business as KEMMERER BUS LINES, KEMMERER, WYOMING,

*Applicant and Respondent,*

v.

K. K. JOHN, ROY WAINWRIGHT, BRUNO BONICELLI, ALBIN ZABOTNIK and TONY ROLETTO,

*Protestants and Appellants.*

(No. 2290; March 27th, 1945; 157 P. 2d 552)

For the Applicant and Respondent the cause was submitted upon the brief and also oral argument of Louis Kabell, Jr., Esq., of Evanston, Wyoming.

For the Protestants and Appellants the cause was submitted upon the brief and also oral arguments of Glen G. Stanton, Esq.., and W. A. Muir, Esq., both of Rock Springs, Wyoming.

## OPINION

BLUME, Chief Justice.

This is an appeal from an order of the district court of Lincoln County, Wyoming, confirming an order of the Public Utilities Commission increasing the fares to be charged by the applicant on bus lines running from Kemmerer to Cumberland and Kemmerer to Gomer. From that judgment of the district court the protestants have appealed.

One Arthur Gore is the owner of the bus lines above mentioned. One of the bus lines runs from Kemmerer to Cumberland, a distance, for the round trip, of 31 miles and the rate or fare charged previous to the time of the hearing herein was $4 for 12 rides to and from the mine at Cumberland, Wyoming. Other busses travel from Kemmerer to Gomer, Wyoming, a distance of 14 miles for the round trip, and the former charge was $2.75 for 12 rides to and from the mine at Gomer. The main passengers traveling on these busses appear to be coal miners. Sometime in the early part of 1943, the exact date not appearing, Arthur Gore, herein mentioned as the applicant or as the Transportation Company, made an application to the Public Utilities Commission of this State for an increase in the fare, or rate to be charged for the transportation of the pas-

sengers to and from these mines, proposing to give 10
rides to and from the mine at Cumberland, Wyoming,
for $4, sales tax included, and to give 10 rides to and
from the mine at Gomer, Wyoming, for $2.75, sales
tax included. It may be noted that the difference in
these rates is that formerly 12 rides were given instead
of 10 rides for the sums stated. A number of people,
hereinafter called protestants, filed a protest with the
Public Utilities Commission against the increase of
these fares, the date of the filing of the protest not ap-
pearing. On March 2, 1943, the Public Utilities Com-
mission made and entered an order that a hearing on
the proposed increase of fares should be held on April
6, 1943, at the Court House in Kemmerer, Wyoming,
and the increased fares were suspended until the final
disposition of the case. A hearing, accordingly, was
had on April 6, 1943, before the Hon. M. P. Holt, Man-
ager of the Transportation Department, and before
the Hon. E. A. Prieshoff, member of the Public Utilities
Commission. The applicant, Arthur Gore, appeared
and presented evidence by his son, Thomas Gore, while
the protestants were represented by Glen G. Stanton,
Esq., and W. A. Muir, Esq., Attorneys at Law. On
May 4, 1943, the Public Utilities Commission made and
entered an order permitting the increase of the fares as
asked by the applicant, which omitting the title, is as
follows:

"In a petition filed with this Commission Proponent
sought to increase certain bus fares in Intrastate com-
merce. Upon formal complaint this Commission en-
tered into a hearing in the matter at Kemmerer, Wyo-
ming, on April 6th, 1943. Prior to said hearing the
above named fares were suspended until April 15th,
1943, and subsequently to May 10th, 1943.

"Witnesses for Proponent testified generally to the
inadequacy of fares presently effective in connection
with the operation conducted by Proponent, such testi-
mony following the contention that such fares failed

to produce sufficient revenue to maintain a safe, sound, and adequate transportation agency. Testimony was further produced showing gross earnings and gross costs of operation. Annual reports covering Proponent's operations were submitted as evidence and figures therefrom relied upon to show the earnings produced in the operation in question.

"A careful study of all of the testimony submitted at time of hearing and briefs submitted in the matter has been made by the members of this Commission. Taking the figures as submitted in testimony by Proponent's witness for the first three months of 1943, namely; January, February, and March, which period is considered to be representative of any period during the winter months, and probably considerably above the average of any operating period for an entire fiscal year, it is indicated Proponent produced an average net revenue per month for the three months above named of less than $100.00 per month. It is further noted no salary or other allowance has been deducted from the gross revenue of the company to cover expenses or wages incurred in the operation of the business by the owner-operator. It is further noted that if such rightfully deductible amount has been made in any reasonable figure the company would have shown a deficit for the operating period, namely; the first three months of 1943.

"Careful study of testimony, produced by Protestant's witnesses and brief submitted by Counsel representing Protestants in the matter would indicate same is based on that which is potential rather than factual. It further appearing that Proponent has complied with all of the requirements concerning increases in rates, fares, and charges as concern the Office of the Price Administration, and that the proposed rates under investigation in this instance are not unreasonable, discriminatory, or preferential, and that such rates are lawful in all respects, therefore

## ORDER

"IT IS HEREBY ORDERED That the operation of such rates, schedules, and practices which are filed with this Commission as follows:

"Kemmerer-Gomer Route, a distance of fourteen

miles, ten rides to and from mine; $2.75, tax included.

"Kemmerer-Cumberland Route, a distance of thirty-one miles, ten rides to and from mine; $4.00, tax included.

be and is hereby granted, to become effective as of May 10th, 1943."

The protestants filed a notice with the Public Utilities Commission of an appeal from that Commission to the district court of Lincoln County, Wyoming. The notice is not dated, nor does it appear when it was filed with the Public Utilities Commission, except that it is shown that it was received sometime in May, 1943. In view of the fact that Section 46, Chap. 65, S. L. of 1935, prescribed 15 days for the time of appeal, it is important that the exact date when the notice thereof was received by the Commission should appear. Since, however, no point appears to be made in that connection we shall disregard it.

I. Counsel for the applicant argues that no proper record was filed in the district court of Lincoln County, Wyoming, on account of the insufficiency of the certificates thereto attached. He made a motion to dismiss the case on that ground in the court below. There is attached to the record filed in the district court a certificate of the Reporter that the proceedings in the case were taken down by him and transcribed, but it does not appear therefrom or from any other certificate that all the evidence taken in the case is embodied in the record and we held in Robinson v. Gallagher Transfer and Storage Co., 58 Wyo. 69, 125 P. 2d 157, that a certificate which is defective in that regard is not sufficient. There was also attached to the record a certificate signed by M. P. Holt, Manager, Transportation Department, certifying that certain documents were true and correct copies of the originals. Section 49, Chap. 65, S. L. of 1935, provides that the Commission

shall make copies of all documents and pleadings forming the issue for the hearing before it and certify the same to the court together with its bill of costs. We find no authority in the statutes granting power to the Manager of the Transportation Department to make such certificate. Counsel for the protestants recognized the deficiency in the certificates attached to the record, and filed a motion in the district court to return the record for proper certification by the Public Utilities Commission. That motion was sustained over the protest of counsel for the applicant, and the record was sent back to the Public Utilities Commission, properly certified and returned to the district court of Lincoln County, Wyoming. It is argued by counsel for the applicant that the trial court had no power to send the record back as above mentioned and that the proper certification came too late. It is not necessary to decide that contention.

II.   Counsel for the applicant contend that the district court of Lincoln County has no jurisdiction of the appeal. Chap. 119, S. L. of 1933, amending Sec. 94-159, Rev. St. of Wyo., 1931, provides in part:

"Any party in interest * * * being dissatisfied with any order of the Commission shall have the right to appeal as hereinafter provided. The applicant may, within 90 days after the rendition of the order of the Commission, file a petition of appeal with the district court of Laramie County."

The appeal was not taken to the district court of Laramie County, but to the district court of Lincoln County of this State. The claim that it was proper to do so seems to be based on Sec. 47, Chap. 65, S. L. of 1935, which provides:

"An appeal from any final order or judgment of the commission may be taken to the district court of Laramie County, Wyoming, or to the district court of the county in which *appellant's* principal place of business is situated." (Italics supplied.)

Counsel for the Transportation Company is correct in his assertion that it does not appear in the record where the principal place of business of appellants is, or that they have any at all. Apparently the Legislature had in mind only a public utility, including a transportation company, which would appeal to the district court. It apparently did not have in mind any individuals like the protestants herein who might be the applicants. It is probable that appellants, such as the protestants in this case, seldom, if ever, have any principal or other place of business within the contemplation of Section 47, supra. If, accordingly, we accept the literal meaning of that Section, the district court of Lincoln County never had any jurisdiction to hear the appeal from the Public Utilities Commission. Since this point, however, is not seriously pressed by the applicant, and since it is not necessary to do so, we shall not decide the point.

III. It does not appear herein what points, if any, were raised by the protestants in the trial court. It is a rule of almost universal application that with the exception of such matter as jurisdiction or other fundamental matters the supreme court will not consider any questions which have not been considered by the district court. Thus it is stated in 4 C. J. S. 430:

"Subject to a few exceptions, the rule is of almost universal application, in many jurisdictions by virtue of express statutory provision, that questions, of whatever nature, not raised and properly preserved for review in the trial court, will not be noticed on appeal;"

See also innumerable cases cited in the Decennial Digest under the subject of Appeal and Error, Section 169. The statute makes no reference to that matter, but it is a rule of procedure adopted by appellate courts, partly for the reason that it would be unfair to raise questions in an appellate court which have not been raised in the trial court. The rule seems to be of more

than ordinary importance in a case like that at bar, which involves rates or fares in which the public is interested and the continued solvency of a necessary transportation company is at stake. And it has been applied in cases such as that before us. Public Service v. Utilities Co., 289 U. S. 130, 53 Sup. Ct. 546; Suburban Transportation System v. Furse, 13 Wash. 2d 345, 125 P. 2d 266; Georgia Public Service Com. v. Georgia Power Co., 182 Ga. 706, 186 S. E. 839; C. B. & Q. R. R. v. Commerce Com., 364 Ill. 213, 4 N. E. 2d 96; Fulmer v. R. R. Com'rs., 96 Mont. 22, 28 P. 2d 849. Since, however, the case at bar is the first rate case which has been before this court, we have deemed it advisable to examine the various contentions made herein, but shall not reverse the judgment of the trial court unless we should find some fundamental error herein.

IV. The hearing herein was held, as already stated, before one of the members of the Public Utilities Commission and before the Manager of the Transportation Department, the former participating to some extent in the examination, but the latter making the various rulings necessary to be made in the case. It is contended by counsel for the protestants that the Manager of the Transportation Department had no right to hold such a hearing, and that it was vitiated for that reason. Section 94-142, Rev. St. 1931, provides:

"Whenever the commission shall determine to conduct an investigation of any matter provided for in this chapter, either with or without complaint as in this chapter provided for, it shall fix a time and place for a public hearing of the matters under investigation, and shall notify, by registered letter requiring receipt, the complainant, the person complained of and such other persons, as it may deem proper of such time and place of hearing, at least twenty days in advance thereof. At the hearing held pursuant to such notice, the commission or commissioner authorized by order of the commission to conduct such hearing, may take such

testimony as may be offered, or as they may desire, and may make such other and further investigation as in its opinion, is desirable."

It appears from that provision that a hearing may be conducted by the Public Utilities Commission as a whole or by a member thereof, who may be authorized to do so by the Commission. We do not find any statute which authorizes anyone alse to conduct such hearing, although other duties as, for instance, examination of books, may be delegated to others. See Section 94-114, Rev. St. 1931. It appears in the case of Great Northern Ry. Co. v. Dept. of Public Works, 137 Wash. 548, 242 P. 1092, that a hearing before the Department of Public Works was conducted by a person not authorized to do so by the statute. The court held that the matter was not jurisdictional and that the order of the Department should not be reversed on that ground when no objection had been made when the hearing was held and no motion had been made in the court below to suppress the evidence. In the case at bar no objection was raised at the hearing that Mr. Holt had no author-, ity to act, nor was a motion made in the trial court to suppress the evidence. It is generally held that an appellate court will not reverse an order of Public Utilities Commission unless the objection was raised before the Commission. Pacific G. & E. Co. v. Securities & Exchange Com., 127 Fed. 2d 378; C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2; Lang v. Railroad Commission, 2 Cal. 2d 550, 42 P. 2d 639; 51 C. J. 73. Moreover, in the case at bar a member of the Public Utilities Commission was present at the hearing and it is doubtful that it could be said that the hearing was not before him ,and we rather think that there would be no objection for an expert, such as Mr. Holt probably was, to aid and assist one of the members of the Commission or the whole thereof. All rulings in hearings should, of course, hereafter be made by the Com-

missioner and not by anyone else. In other words, the hearings should in fact be held before the Commission or a member thereof authorized to do so by the Commission.

V.   The witness, Thomas Gore, when on the witness stand, had figures before him which, if we understand it, were contained in previous reports made by the applicant to the Public Utilities Commission or were to be embodied in a report as yet to be made to the Commission. The protestants asked that a subpoena duces tecum be issued for the production of the books of the Transportation Company. The Commission has the power to order such production. Section 94-147, Rev. St. 1931. The Commission, while not refusing to issue the subpoena, did not do so, ruling that the witness should proceed to testify in the manner as proposed by him, saying that it would take too long a time to go over all of the books, and because reports to the Commission are sworn to and are checked by the Commission. Protestants contend that the ruling was error. Counsel cite us to a number of cases in which it has been held that the protestants were entitled to an inspection and examination of the books of the Transportation Company. That such right ordinarily exists, and generally for the purpose of preparing for a trial, is doubtless true. 51 C. J. 58-59. A hearing involving the reasonableness of rates would in the ordinary case involve the value of the property, and the expense and income of the utility. In many cases, at least, these items would not appear, or not clearly, except from the books, and when such items are in dispute and will appear clearly only from the books then these books should be produced. However, it is held that notice of the production of books should be given and that "a notice given at the trial is ordinarily not sufficient unless the desired papers are readily accessible and easily produced and no delay in the trial will result from

granting the demand for production." 32 C. J. S. 671. The Commission thought that in this case the hearing would be delayed. There is nothing in the record to show that it would not have made an order for production if application had been made before the trial. However, that may be, it was not so much an examination and inspection of the books, as we understand it, which counsel wanted, as it was to test the accuracy of the various items testified to by Thomas Gore. The books of the applicant are, probably, not very extensive; probably all of them referred to matters in dispute herein; and we think that, though the request for them was not made until the hearing, it was a reasonable request and should have been granted, since they seem to have been located in Kemmerer. The Commission, or Commissioner, should not refuse an order of production merely because the hearing would take somewhat longer. Even though reports to the Commission are made under oath, a protestant as to rates should, nevertheless, be permitted to test the accuracy thereof, just as the Commission has the right to test the accuracy thereof under the provisions of Section 94-114, Rev. St. 1931. And the ruling of the Commission herein was, we think, error. Whether the error was fundamental is another thing. The books of the Transportation Company could not, as already indicated, have been very extensive. It is a small concern. Its investments were comparatively few . The income was derived from one source, the sale of tickets. The different items of expense were not numerous, as shown by the itemized account hereafter shown. Thomas Gore kept the books. He testified to each of the items constituting the investments. He also was cross-examined at length as to the items of income and expenditures, particularly as relating to the first three months of 1943, which are of the greatest importance herein. Being the son of the owner, vitally interested in the

affairs of the bus line, he doubtless had an independent recollection of the items shown in the accounts, or at least the approximate amounts thereof. His testimony indicates that to be the fact. It would have been better, however, in the absence of the production of the books, if he had testified to such independent recollection. It is stated in 2 Jones Commentaries on Evidence (2d Ed.), p. 1423:

"Indeed, books of account have always been regarded as a species of secondary evidence, admissible in favor of the party keeping them because of the necessities of the case, not because they are the best evidence of the the testimony of a person having knowledge of the facts, and able to testify to them from memory."

The Commission, or anyone delegated by it, has the right, as already stated, to examine the books of the utility, so that it would be somewhat dangerous for anyone to make a report to the Commission which is contradicted by the books of accounts. In Damariscotta-Newcastle Water Company v. Water Co., 134 Me. 349, 186 Atl. 799, the court said that, "though it is true that * * * hearings before the public utilities commission the ordinary rules of evidence apply, yet the mere erroneous admission or exclusion of evidence will not invalidate an order of the commission. Substantial prejudice must be affirmatively shown." We seriously doubt that any prejudice could be shown, even if the books were produced. Taking all the facts into consideration, including those hereafter mentioned, we cannot regard the error, committed by the Commission herein, so fundamental as to warrant us in reversing the case for that reason.

VI. Much evidence was introduced to show the income and expenses of running the business of the applicant herein. Upon cross-examination of Thomas Gore, theoretical income, based on averages, was attempted to be shown and counsel do so also in their

brief in this court. For instance, it was attempted to be shown that the income for 1942, based on the average number of passengers, was $21,627.84, and Thomas Gore stated that it actually never exceeded one-half of that. The Commission evidently based its figures upon actual income and actual expenses and that, obviously, is the safer method, and we shall not attempt to follow counsel in their attempt to arrive at the income in some other manner.

It appears that the applicant had revenue in the year 1941 of $7,987.85, and expenses in the sum of $8,679.97, so that he operated at a loss during that year. In 1942 the revenue was $12,919.50, and the expenses were $12,399.38, thus netting a small income, without, however, considering any compensation to Thomas Gore. If we take the figures of these years, it is clear that the Utilities Commission was fully justified in granting the increase in fares. The witness, Thomas Gore, testified and his itemized statement shows that the income for the first three months of 1943 was $4,447.25, and the expenses $4,628.98. These expenses were subsequently itemized according to a report submitted, or to be submitted, to the Public Utilities Commission, and that itemization shows an expense somewhat less than that stated in the original testimony, but it still showed a loss. In that connection we may call attention to the fact that the item of telephone and for rent of storage appears in only one month; that of lights in only two months. Two of these items, at least, that of lights and that of telephone would doubtless recur every month, and the testimony shows that $32.50 rent was paid every month. Moreover, we find no local taxes included in the itemization, so that we cannot be certain that the sum of $4,628.98 was not more nearly correct than the amount shown in the itemized statement, the difference perhaps being due to the confusion in the hurry of the hearing. The

itemized account of expense shown in the record (bulking the items for the three months) is as follows:

| | |
|---|---:|
| Drivers Salary | $1447.19 |
| Oil | 30.00 |
| Gas | 621.86 |
| Repairs | 1012.96 |
| Internal Revenue & Victory Tax | 39.65 |
| Highway Fee, and Sales Tax | 219.19 |
| Telephone | 16.83 |
| Lights | 11.10 |
| Rent for Storage | 32.50 |
| Licenses | 107.50 |
| Depreciation | 425.00 |
| Insurance Used | 134.00 |
| Miscellaneous | 29.29 |
| Income Tax Paid at Source | 282.51 |
| Loss Due to Theft | 145.00 |
| | $4554.58 |

The Commission did not accept this statement in its entirety. It stated in its opinion that the applicant, according to his itemized statement, would have a net income (not considering salaries which could properly be charged) of a little less than $100 per month so that the Commission must have figured the expenses for the three months at approximately $4147.25.

Counsel for appellant, in their brief, attempt to reduce this amount, as hereinafter indicated, to $3462.94, and multiplying it by four so as to obtain the result for the entire year would make $13,851.76. They, accordingly, state in their brief, as follows:

"In order to be fair, let us assume that the Kemmerer Bus Lines' expenses in 1943 will amount to the higher figure, or the sum of $13,851.76. What then will be the approximate net income of the bus line for a year? Let us first compute the net profit according to proponent's Exhibit No. 3. According to this Exhibit the gross income of the bus line, sales tax not included, would average $1,452.76 a month, or $17,433.12 a year. Deduct from this the expenses of the bus line as computed above, in the sum of $13,851.76, and the net in-

come for the company will amount to $3,581.36. We submit that this amounts to a very good return for a company that started the year with assets totalling approximately $5,549.12."

To reduce the expenses for the first three months of 1943 to $3,462.94, as above mentioned, various matters are referred to by counsel for the protestants. For instance, it appears herein that the busses owned by the applicant cost $6,808.00, and the depreciation should be based on the depreciated value as of January 1, 1943, namely, on the sum of $5,549.12, and that, accordingly, the amount of depreciation shown by the itemized account above should be reduced from $400 to $290.75. We think that counsel are in error. According to their method of figuring there never would come a time when the full depreciation would be taken, though, of course, the amount remaining would soon be infinitesimally small. Counsel also object to the amounts paid out for sales taxes on the ground that these taxes are paid by the purchasers of the tickets. That is true, but the testimony shows that the gross income included these taxes. Hence, there was no error in also including them in the expenses.

Counsel argue that the items for licenses in the sum of $77.54 and $30.00 should be prorated for the year; that the amount paid for internal revenue and the victory tax, which seems to have been paid on behalf of the employees should be eliminated from the account. So far as we can see these contentions are correct. It is claimed that the amount paid for income tax at its source should also be eliminated. Some of it was apparently paid by the owner of the busses on account of salary received by him from another source so that the contention is, at least, partially correct; to what extent does not appear from the record before us. Eliminating this item entirely and apportioning the others would reduce the item of $4554.58 by $322.82. Counsel

would also apportion the sum of $400.00 due to repairs for accidents in January and instead of figuring $400.00 would figure only $100.00. Mathematically speaking, counsel are correct. Counsel would also allow nothing for the loss of $145.00 which was stolen, but, of course, matters of that kind will happen. The money would not have been able to have been stolen, except for the fact that the applicant was in business, and business is necessarily exposed to various hazards which can hardly be overlooked in determining whether at the end of the year the owner thereof will have a gain or a loss. Particularly in a business like that in which the applicant is engaged, contingencies of various kinds are apt to arise which cannot be foreseen, and by reason of which expenses are incurred. Even this case is a good illustration. The applicant herein attempted to get along without an attorney. His son appeared and presented all the evidence on applicant's behalf. That, of course, was a mistake. Later the expenses of engaging an attorney was forced upon him, though that was unforeseen. It is hardly fair to say that the commission must entirely leave out of consideration contingencies which are apt in the very nature of things to arise in connection with the business of the applicant, and to insist upon a strictly mathematical basis arising in any one month or any three months. In Pennsylvania Power & Light Co. v. Public Service Commission, 128 Pa. Super. Ct. 195, 193 Atl. 427, 435, it was held that it is error to fix a rate without consideration of the risks and uncertainties involved. See also 12 C. J. S. 666; In re Arkansas Rate Cases, 187 Fed. 290, 306. Thomas Gore testified that the bus travel during the summer months does not compensate for the winter months, by which we presume he meant that the income in the summer months would not compensate for the greater expenses in the winter months. The Commission found that the first three months of the

year were representative of winter months, "and probably considerably above the average of any operating period for the entire fiscal year." Moreover, we do not think that we should, in this connection, entirely overlook facts which are common knowledge. Every person of mature years who has traveled at all knows the cost of transportation for passengers in a general way. Rates on coaches of railroads were discussed by the Interstate Commerce Commission, and statistics cited in "Passenger Fares and Surcharge," 214 Interstate Commerce Commission Reports, 174-178; in "Eastern Passenger Fares in Coaches," Vol. 237 of the same Reports, 271-290, and in "Increased Railway Rates, Fares and Charges," Vol. 248 of the same Reports, 545-625. It appears therefrom that a rate for coach fares has been ordinarily 2c to 2½c per mile and not lower, or at least not much lower, than 1½c per mile. We have found no satisfactory statistics in connection with passenger fares on busses. Of course, the charge in one case does not necessarily show that it is reaonable in another, but may at least serve as a general indication of whether or not the charge in a particular case is greatly disproportionate to the charges in similar cases. See 13 C. J. S. 678. In the case at bar, the charges for a round trip from Kemmerer to Cumberland, a distance of 31 miles, was 33⅓c ,sales tax included, or slightly more than 1c a mile; it would be slightly less than 1¼c per mile, sales tax included, at the increased fare. Probably few, if any, fares in the United States will be found lower than that. The fare from Kemmerer to Gomer, a distance of 14 miles for the round trip, is higher and on just ground, for it "is well recognized that the cost of transportation, per mile, decreases as the length of the haul increases." 13 C. J. S. 668. It was formerly about 1.64 cents per mile; under the new rate it is a little less than 2 cents per mile, sales tax included.

And to determine whether any basis for just complaint exists on the part of the protestants, we must consider another factor. The Commission stated in its opinion that a salary (for Thomas Gore) was rightfully deductible from the income of the applicant and that if such salary had been deducted there would have been an operating deficit for the first three months of 1943. Counsel for the appellants claim that it was error to consider such salary, since there is no basis for it in the evidence in this case, and that findings must be based thereon. See 51 C. J. 60. There is, of course, no doubt that ordinarily there should be evidence of salary, if it is payable. In this case it was shown that the property involved herein was owned by Arthur Gore; that Thomas Gore, his son, was the bookkeeper, and judging from his testimony, he was probably the general manager of the bus lines. He testified that the property was treated as one in which the whole family was interested and that, accordingly, no salary was paid to him, that is to say, to Thomas Gore. We think that in such case it would have been sufficient if the value of the services of Thomas Gore had been shown. That was not done. Nevertheless, to hold under the circumstances herein that the Commission has no right to take anything in that connection into consideration would be patently unjust. No attorney appeared for the applicant herein and courts have always been more liberal in overlooking errors when laymen appeared in their own behalf than in other cases. Counsel for appellants knew, or must have known, that it would be unfair not to allow Thomas Gore a reasonable compensation. They had ample opportunity to examine him and find out what he considered to be the reasonable value of his services. The Public Utilities Commission of this State may well be presumed to know such reasonable value and under the circumstances herein we think that the Commission committed no

error in this connection. We might further mention incidentally that counsel for appellants have overlooked the going-value of applicant's business which was valued by applicant at $5,000.00. Taking all the facts herein into consideration, it must be quite clear to everyone concerned that this court would be wholly unjustified in holding that the Commission erred in raising the fares herein involved. The record herein does not disclose that there is any transportation company other than that of applicant to serve the needs of the coal miners in the region in question. If that is correct, then the existence of the transportation company here involved would seem to be not alone convenient, but necessary. It would not take long for a small bus line like that of the applicant to go bankrupt, if compelled to run at a loss, and a small saving to those who use it for a limited time would not compensate for their loss in the long run. It is the duty of the Commission to protect the public against unreasonable charges, but it is not its function to render the public a disservice, rather than a service.

VII. Section 46, Chap. 65 S. L. of 1935, states that, "in rendering a decision on all contested hearings, the commission shall make and file a concise statement of its findings of fact in its final order and decision." Counsel for protestants contend that the order made by the Commission lacks findings of facts, which are required by the statute and the ruling of the courts. Counsel could have rendered the court a real service had they pointed out what, concretely, the Commission should have done and stated. It is difficult at times to determine whether a statement is a fact or a conclusion, or a statement of a mixed fact and conclusion. That is well known, and many cases are found on the point under the subject of pleadings. See 49 C. J. 46, et seq. In State ex rel. Utilities Commission v. Coach Company, 218 N. C. 233, the court stated that, "in com-

mon practice it is often difficult to separate conclusions of fact from conclusions of law. The statute, however, does not require any high degree of formality in this respect, and it is not the practice of this court to allow mere form to defeat substantial justice, or to disregard pertinent matter for want of proper labeling." In Clambey v. Copland, 52 Wash. 580, 100 P. 1031, the court stated that unless they are clothed in the very words of the evidence on which they are based, practically all findings of ultimate or general facts are conclusions of facts based on detailed facts and circumstances shown by the evidence. And see 64 C. J. 1251-1252. In Great Northern Ry. Co. v. Department of Public Works, 161 Wash. 29, 296 P. 142, 144, the court, said that a finding to the effect that "the rate assailed is and for the future will be unreasonable to the extent of 9 cents" is possibly a sufficient finding. In Consolidated Flour Mills v. Gas and Electric Company, 119 Kans. 47, 237 P. 1037, it appears that the statute required a finding as to the reasonableness of the rate, and the court held that a finding that an existing rate required a change was a sufficient compliance with the statute. On the other hand, in State v. Tri-State T. & T. Co., 204 Minn. 516, 284 N. W. 294, 300, the court stated:

"Likewise in the case of due process the single finding that existing rates are unreasonable is a conclusion and insufficient unless supported by findings of fact more particularly stated which demonstrate the grounds upon which the conclusion is based so that the court may determine whether the order proceeds from a conscientious consideration of the evidence or is arbitrary."

In Tesch v. Industrial Commission, 200 Wis. 616, 239 N. W. 194, the court stated:

"Differentiation of findings of fact and conclusions of law is admittedly often a difficult task. Probably no better rule of thumb can be devised than that suggest-

ed in Weyauwega v. Industrial Comm. 180 Wis. 168, 192 N. W. 542, where it is said: 'Whether a finding is an ultimate fact or conclusion of law depends upon whether it is reached by natural reasoning or by the application of fixed rules of law.' That is, where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law and is not a finding of fact."

The finding. by the Commission in the case at bar to the effect that the earnings of the Transportation Company, aside from allowable salaries, was less than $100 per month, and that with the allowance of such salaries there would be a deficit, is not arrived at by applying any rule of law and hence, if the criterion in the Wisconsin case is correct, the finding of the Commission as above made must be construed as a finding of fact. The cases cited by counsel for the protestants hold that the finding should be sufficiently specific. Some of the leading cases on that subject are Beaumont v. U. S., 282 U. S. 74, 51 Sup. Ct. 1, 6, 75 L. Ed. 221; Chicago Railways Co. v. Commerce Commission, 336 Ill. 51, 167 N. E. 840, 67 A. L. R. 938; Scranton Spring Brook Water Service v. Public Service Commission, 105 Pa. Super. Ct. 203, 160 Atl. 230; State v. Tri-State T. & T. Co., supra; Northern States Power Co. v. Board of R. R. Commissioners, 71 N. D. 1, 298 N. W. 423. In the Beaumont case, the court said in part:

"The Commission's failure specifically to report the facts and give the reasons on which it is concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to the matter essential to the case, and imposes unnecessary work upon the courts called upon to consider the validity of the order. Complete statements by the commission showing the grounds upon which the determinations rest are quite as necessary as are opinions of lower courts."

In the Pennsylvania case, the court stated in part:

"It is essential that the report of the commission, or

the record in some way disclose precisely the elements involved and the processes and methods by which the commission reaches its findings and conclusions on the evidence. * * * It is not only of value to the courts, but it is essential that counsel for the parties should have the information for the purposes of determining whether further proceedings should be had and how they should be conducted. * * * If we are to determine whether or not the 'findings' are reasonable and proper, we must have definite and specific findings to consider. * * * Where the evidence is conflicting, we must be able to determine from the report what evidence the commission considered credible, and therefore worthy of adoption ,and what evidence it rejected."

The cases from which we have quoted, or which counsel have cited, were cases involving large corporations, and those involving rates have turned in the main on the question of valuation of the property of the corporation. That factor is of comparative unimportance in the case at bar. This case revolves mainly round the items of expenditure—items mostly too unimportant to be even considered in the cases cited. Hence, these cases are of aid only in a general way. Section 94-118 and Section 94-121, Rev. St. 1931, prescribe what factors shall be taken into consideration in determining rates or fares. We need not copy these sections. They do not prescribe that the determination of these factors shall all be set out in the finding of facts. Section 46 of Chapter 65, S. L. of 1935, states, as noted, that the findings shall be concise. Just what that term denotes must to some extent be determined by experience. The main thing here to be noted is the statement in the Pennsylvania case, supra, that "where the evidence is conflicting we must be able to determine from the report what evidence the commission considered creditable, and therefore worthy of adoption, and what evidence is rejected." That the Commission adopted the evidence of Thomas Gore in a general way, and rejected the evidence of the witnesses for the protestants is

sufficiently clear from the order of the Commission. But it may be noted that we were compelled to indulge in conjectures as to just what items of expenditures testified to by Thomas Gore the Commission accepted and what items it rejected. That should not be necessary. In such case the Commission should be specific. We do not, however, at this stage of the development of our law on rates and fares, consider the lack thereof sufficient grounds to reverse the case. An examination of the evidence in the case sufficiently discloses the fact that we would not be warranted in holding that the Commission arrived at result, which in the language of Section 53, Chapter 65, S. L. of 1935, is in excess of the authority of the Commission, or that the order was procured by fraud, or that it is in conflict with law or that it is not supported by substantial evidence. Courts will not substitute their own judgment for that of the Commission on administrative matters. 51 C. J. 75. In fact, the main point urged by counsel in discussing the insufficiency of the finding of facts is that the Commission used the term "indicated" instead of "shown," or "proven." We do not believe that the decision of this court should be based on so narrow a ground.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

*Affirmed.*

RINER, J., and KIMBALL, J., concur.